[PHILADELPHIA, FEBRUARY 16TH, 1839.]

## HAND *against* BAYNES.

#### IN ERROR.

The defendant, who was the owner of a line of vessels engaged in transporting goods from Philadelphia to Baltimore, received certain goods belonging to the plaintiff, on board of one of his vessels, and gave a receipt in the following words : " Rec'd on board Hand's Line for Baltimore, via Chesapeake and Delaware Canal, from J. B." (the plaintiff,) " 100 slaughter hides on deck, which I promise to deliver to J. D. at Baltimore, the dangers of the navigation, fire, leakage and breakage excepted, he or they paying freight eight dollars, and porterage $1 50." The vessel left Philadelphia, and on arriving at the mouth of the canal, the captain was informed that the locks were out of order, and that he could not be allowed to pass through the canal. He then proceeded down the bay, and out to sea, with the intention of going round to Baltimore, but in a gale of wind the vessel struck on a shoal, and with the cargo was totally lost. Evidence was given on the trial that the hides had been purchased by the plaintiff, and there was no evidence of any property in J. D. the consignee: *Held*, (1st) That this was a contract to carry the goods to Baltimore *through the canal.* (2nd) That the circumstances did not excuse the deviation from that route. (3rd) That the clause in the receipt excepting " the dangers of the navigation," did not apply to the case of the canal being impassable by inevitable accident or otherwise. (4th) That the plaintiff was entitled to maintain an action against the carrier for the loss of the goods. (5th) That the value of the goods was the proper measure of damages.

ON a writ of error to the District Court of the City and County of Philadelphia, it appeared that James Baynes brought an action on the case in that Court to June term, 1836, against Joseph Hand, to recover from the defendant the value of certain hides shipped on board a vessel called the Neptune, belonging to the defendant, and intended to be carried to Baltimore by the way of the Chesapeake and Delaware Canal, but which were lost at sea.

The cause was tried on the 3rd of April, 1837, before JONES, J., when the plaintiff's counsel gave in evidence the following receipt or bill of lading, signed by the defendant's clerk or agent, viz.

(Hand v. Baynes.)

"Philadelphia, January 14, 1836.

Received on board Hand's Line for Baltimore, via Chesapeake and Delaware Canal, from J. Baynes, one hundred slaughter hides, on deck, which I promise to deliver to Joseph Davenport, at Baltimore, the dangers of the navigation, fire, leakage and breakage excepted, he or they paying freight eight dollars, and porterage one dollar and fifty cents.

*Per Sloop Neptune.*

H. HAND, Per
H. H. ELDRIDGE."

The plaintiff then produced a witness who proved that he sold to the plaintiff, on the 12th of December, 1835, one hundred slaughter hides, the net value of which was $349 57, which was the sum the plaintiff paid him for them.

The following advertisement, published by the defendant in the American Daily Advertiser, of March 25th, 1836, was then given in evidence on the part of the plaintiff.

"Baltimore Packet Notice. Hand's Line above Market street. As the Chesapeake and Delaware Canal is at present impassable, and will probably remain so for several weeks, all shippers per sloops Union, Capt. Biddle, Neptune, Capt. Scott, Anna Maria, Capt. Layman, and William Penn, Capt. Pettit, are requested to call immediately at the counting-house of the subscriber, and have their bills of lading altered, so as to permit their goods to be transferred to the schooner Col. Crockett, which is now loading for Baltimore by sea.

JOSEPH HAND,
March 25—1t."                               7, North Wharves."

The defendant's counsel then gave in evidence a protest made by the master and mate of the Sloop Neptune, as follows.

"Virginia, Northampton County, Sct.

By this public instrument of protest be it known, &c. That on the 8th day of April, A. D. 1836, before me, John S. Parker, a justice of the peace, in and for the said county and state, (there being no notary public in the district of the said county) personally came and appeared Benjamin Scott, master of the sloop called the Neptune, of Philadelphia, of the burthen of forty-six tons or thereabouts, belonging to the port of Philadelphia, and Thomas Eccles, mate of the said sloop, who being severally sworn, declared that the said sloop being laden with brandy, glass, chocolate, dry goods, ginger, tallow, hides, iron and other hardware, brooms, &c. on the 26th day of March last, they, the said appearants, set sail on board the said sloop from Philadelphia, bound directly to the port of Baltimore: that on Sunday the 27th day of March last they arrived

at the mouth of the Chesapeake and Delaware Canal, on the Delaware side, and applied for permission to go through the said canal, but were informed that the locks, were in such condition as not to admit of the passage of the said sloop through the said canal, and therefore the said sloop was compelled to keep on down the Delaware Bay till they got down to Morris River, where the said sloop lay two days with the wind, when they anchored, blowing from about east—that after that they went down the bay to the breakwater, and the wind blowing from the south-east, they remained there till Sunday the 3d day of April, instant; that on the 3d instant the wind came round about north-west, and they weighed anchor and proceeded out of the bay, and after it became calm or nearly so, and continued so until about 12 o'clock at night, when a few hours the wind hauled around to about east, and about daylight or sunrise on Monday the 4th inst. the wind hauled to about northeast, and about 12 o'clock m. began to blow very fresh and stormy, and afterwards hauled to N. N. E.—that it was very thick and stormy all day, and saw no land until about 3 o'clock p. m. on the 4th inst; shortly after seeing which, the said sloop struck on Matchapungo shoals, where a very heavy sea was setting in, and the wind blowing nearly a gale.   That in the course of two hours after the said sloop struck she went entirely to pieces, and the said appearants and the hands belonging to her took to the boat and made their way to a small sand shoal, where they remained till the tide forced them away, when they went ashore on Prout's Island, where they remained all night; and on the 5th inst. they were towed over to Hog Island by a boat which came from there, where they remained till yesterday the 7th inst., when they came to the mainland.   That none, or very little, if any, of the property which was on board the said sloop was saved before the said appearants left the said island.   And the said appearants did further severally declare on oath, that the said sloop, at the time of her departure from Philadelphia aforesaid, upon the said intended voyage, was tight, staunch and strong, and had her hatches well and sufficiently caulked and covered, and was well and sufficiently manned, provided and furnished with all things needful and necessary for the said voyage; and that during the said voyage the said appearants and sloop's company used their utmost endeavours to preserve the said sloop and the goods of her loading from damage.   And therefore the said Benjamin Scott did declare to protest, and by these presents doth solemnly protest against all and every person or persons whom it shall or may concern, and do declare, that all dangers, losses and detriments that have happened to the said sloop and the goods of her loading, are and ought to be borne by the merchants and freighters interested, or whomsoever else it shall or may concern, the same having occurred as before mentioned, and not by or through the insufficiency of the said sloop, or neglect of the said

appearer, his officer, or any of his mariners.   In witness whereof, the said appearers hereto set their hands, this 8th day of April, 1836."

The deposition of T. H. Eccles, the mate of the vessel, was then given in evidence on the part of the defendant.   The material parts of it were as follows :

"I was mate of the sloop Neptune on the last voyage she made. She was owned by Captain Joseph Hand and Captain Taylor.  The captain was Benjamin Scott.  She had also, as hands on board, Peter M'Cann, and a man named John.   The sloop was at Philadelphia in January eighteen hundred and thirty-six, receiving goods on board for Baltimore,  but was prevented by the ice from sailing. The navigation was stopped till after the middle of March.  The first vessel came up I think on the eighteenth of March, eighteen hundred and thirty-six.  We left Philadelphia on the 26th day of March, 1836.  Before we did so, we heard that the sloop Anna Maria had come out of the Chesapeake and Delaware Canal.  We got down to Delaware City, at the mouth of the canal, on Sunday the 27th of March, 1836, and found the gates stanchioned up. Mr. Newbold, one of the chief directors down there, told us they would not let us into the canal for vessel and cargo and all they were worth.  Mr. Wilson, the collector at the locks told us we would not get through under a month.   We remained there some time, endeavouring to get permission to enter.   I cannot now remember the time we stayed there—a regular journal was kept, but it was afterwards lost with the vessel.   Finding it was impossible to enter the canal, we consulted among ourselves what was best to be done.   We had no orders to go to sea, but as the vessel was perfectly seaworthy, and in all respects fitted for sea, and had made many voyages to sea (I had been in her three voyages by sea) we thought it better for all concerned, both owners of cargo and owners of vessel, to go round to Baltimore by sea, rather than wait a month at the mouth of the canal.   We accordingly proceeded down Delaware Bay, until it came on to blow, when we anchored in the mouth of Morris River, where we remained two days.   It blew hard while we lay at Morris River.   Delaware City is a bad harbour when the wind blows from the east, as it did while we lay in Morris River.   I have known vessels lost there ; that is, at Delaware City.   Among others, a fine sloop, called the Southwark.   I believe if we had remained at Delaware City, during the blow, we should have been exposed to danger, and have had a hard time of it.   After the gale abated, we went down to the breakwater.   I believe we got there on Saturday. We left there on Sunday, the 3rd of April, 1836.   The weather was good, with a nice light wind, when we left there, and continued so till towards daylight on Monday, the 4th of April, when the wind

(Hand *v.* Baynes.)

came out from east, and canted round to north-east, and as it hauled round increased in blowing. About noon it was blowing a gale, and the weather was very thick and hazy. About three o'clock we hove the lead, and found no soundings. Supposing ourselves about the Capes of Virginia, we looked out for land, but saw none for some time. Immediately after seeing land, and while heaving the lead, and in the act of gibing, the sloop struck on Matchapungo shoals, which are about twenty miles to the northward and eastward of the mouth of Chesapeake Bay. The sea was running very high —as high as fifteen or twenty feet. As soon as the sloop struck, the sea broke right over her, and started the deck load, and broke the boat off the davits. We remained on board as long as we could safely do so, and longer, for the boat was capsized alongside. After thumping some time, the sloop bilged. After getting the sails down, the sea ran so heavy as to break the boom into three pieces, and the gaff into two, and washed all our sails away. By hard work we got the throat halyards on to the painter of the boat, and got her alongside, and righted and bailed out. We remained in the vessel till she settled in the sand so much that nothing but the bowsprit was above water. I got into the rigging, and at last into the boat. We got first on to a bar, to which we were driven by the wind, where we meant to stay that night till picked up. While there, the mast was driven out of the sloop, and the bottom of her drifted on to the bar. The bottom looked sound and good. The tide rose and drove us from the bar. Thence we were driven on to Prout's Island, where we remained one night. There were no inhabitants or shelter on the island. The boat bilged and filled on the shore. In the morning we were found by some wreckers, who took us to Hog Island, and from there we got to the mainland. As soon as we got to the mainland, the captain entered a protest with a squire. The protest is hereto annexed, marked A. T. E. It is signed by me. Every thing was done for the safety of the vessel and cargo which could have been done. The vessel was lost entirely by stress of weather. The vessel was good and tight, and well fitted for sea, winter or summer. I would not have been afraid to have gone to the West Indies in her. I had been in her fourteen months before, and had made three trips to sea in her. If the sloop had not been as strong as wood and iron could make her, she could not have stood half as long as she did on that bar. I have been thirteen years following the sea and coasting trade. I served an apprenticeship to the sea for three years and eight months, in a ship out of England, before coming to this country. I have been engaged in the coasting trade of the United States for several years—principally in the trade to the Capes of Virginia. Several vessels have been lost on the same shoals as the Neptune. One called the George Washington was lost a few days before the Neptune. The Neptune started from Philadelphia on Saturday, the 26th of March, A. D. 1836,

(Hand v. Baynes.)

in the morning. The afternoon before they started they heard that a vessel had come through the canal; and that for a few days vessels drawing six feet or six feet and a half water, could get through. When they got this intelligence, they started early on the 26th. The Neptune drew somewhat less than six feet and a half water."

The deposition of Peter M'Cann, one of the seamen, to the same effect, was also read.

The plaintiff's counsel then read (by consent) a certificate signed by the secretary of the Chesapeake and Delaware Canal Company to the following effect:

" The first notice of the opening of the navigation of the canal in 1836 is made by the superintendent, in his letter of the 7th of May. He writes on this date : " Some vessels will, I presume, come out of the canal this afternoon at high water." On the 10th: " I learn from Delaware City that several vessels passed the lock." On the 13th: " We are locking the few vessels that offer." The first pass-bill issued by the collector at Chesapeake was dated March 25th, 1836, for F. B. Diomed, from Chesapeake Bay to Philadelphia—Tolls $4. The first pass-bill issued at Delaware City was dated May 7th, for Anna Maria, Layman, master, from Philadelphia."

The learned judge reserved the questions of law arising upon these facts, and directed the jury to find for the plaintiff, subject to the opinion of the Court upon all the points of law in the case, on the facts given in evidence. The jury found accordingly for the plaintiff; and afterwards, viz. on the 16th of Sept. 1837, the case was argued before the whole Court, who declared it to be their opinion, that upon the facts given in evidence, the plaintiff was entitled to recover, and directed judgment to be entered for the plaintiff.

The defendant's counsel tendered a bill of exceptions which was sealed by the judges, and the cause was removed by writ of error to this Court, and the following specifications filed.

" 1. Because the Court decided that the facts given in evidence were in law sufficient to entitle the plaintiff to recover.

2. Because the Court decided that the contract between the parties being that the goods should be carried by the way of the Chesapeake and Delaware Canal, and they not having been so carried, and loss having ensued, the defendant was liable for such loss.

3. Because the Court decided that under a contract like that between the plaintiff and defendant, the defendant could not carry the goods by any other route than the Chesapeake and Delaware

Canal, nor deviate from that route, though by inevitable accident, or the act of God, the canal was rendered impassable, and so continued for three months after the vessel having the goods on board arrived at its mouth, and was prevented from entering, and the goods would have been endangered by remaining there.

4. Because the Court decided that the clause in the receipt or bill of lading, " the dangers of the navigation," did not apply to dangers caused by the canal being, by inevitable accident, rendered impassable, but only to dangers on the route of the canal; and did not authorise the captain of the Neptune to deviate from the route of the canal, in order to avoid the dangers of the navigation by that route.

5. Because the Court decided that on a contract like that between the plaintiff and defendant, impossibility to perform it, (although executory) did not excuse the defendant, or exempt him from liability to damages.

6. Because the Court decided that the captain of the Neptune was not authorised in law to exercise any discretion as to the route he should pursue when he arrived at the mouth of the canal, found the same rendered impassable by inevitable accident, was unable to enter it, and was satisfied that his vessel and the goods on board would be endangered by remaining at the mouth of the canal.

7. Because the Court, entered judgment for the plaintiff, when in law the judgment should have been for the defendant."

Mr. *F. W. Hubbell* and Mr. *James S. Smith*, for the plaintiff in error.

The first question is, whether the captain could, under any circumstances, justifiably deviate from the route of the Chesapeake and Delaware canal. In the margin of the receipt are the words " Per Sloop Neptune." The rule in respect to insurance is, that the vessel shall pursue the most direct and ordinary route; and the question frequently arises, in what cases is a deviation justifiable. In 1 *Phillips on Insurance*, 179, it is said " the meaning of the parties is presumed to be that the voyage is to be pursued in the most direct and safe course, and the adventure conducted in general in the most expeditious manner, as far as is consistent with safety ; and if there be any departure from such course or mode of conducting the adventure, whereby the risks insured against are varied or increased, it behooves the assured to justify such departure, by showing either a usage in that respect, or a reasonable necessity for it." Now who is to judge of the necessity but the captain, who is the agent of both parties? Did he exercise a reasonable discretion? This was a question of fact, not of law. *Read v. The Commercial Ins. Co.* (3 *Johns.* 352.) 2nd. *Emerigon,* 58, 59, 60. In this case it was

impossible to get through the canal. The case of *Graham* v. *The Commercial Ins. Co.* (11 *Johns.* 352,) is in point, unless there is a difference between the case of insurance and that of freight. The defendants here did not intend to promise an impossibility. 3 *Com. Dig.* 121, *L.* 12 : 114; *L.* 1. *Co. Litt.* 206, (*a*) ; 1 *Phillips on Evid.* 86. 1 *Phillips on Ins.* 130. The contract was made with reference to the kind of navigation, the government of the canal, &c. The defendant was not the owner of the canal, and had no control over its management. A contract made by a transporting company who are also the proprietors of the rail-road or canal, might be differently construed. In every such contract, there is a silent condition that the canal is navigable, just as in the case of a river. Here the contract was made on the 14th of January, but the vessel did not sail until the 25th of March, on account of the ice, which was not complained of. If the contract was not broken by the infirmity of the canal, the carrier had the choice of three courses, 1st, remaining there; 2nd. Coming back to Philadelphia; 3d. Going round by sea. Did he pursue a discreet course in going round ? This was a question for the jury, which, however, was taken from them by the Court. The act of assembly gives power to a judge of the District Court, sitting for the trial of issues of fact, to reserve questions of law, and to withdraw a case from a jury, in the manner of a demurrer to evidence. The counsel for the plaintiff below contended that this was an absolute contract, and that the whole defence ought to be excluded, which was denied on our part, and this point was reserved by the judge. There was no count in the declaration charging the defendant as a carrier, and no evidence that he was such. If the vessel had returned, the insurance, if any, would have been avoided. *Savage* v. *Pleasants*, (5 *Binn.* 415.) On the construction of the receipt, the defendant may be protected from liability. The words " dangers of the navigation" may include breaches in the canal, and stoppages of the passage. The words " dangers of the seas," have been construed to include many things besides storms and tempests. *Abbott on Shipping*, 214, 215. *Garrigues* v. *Coxe*, (1 *Binn.* 592.) 1 *Marshal on Ins.* 191. It is said that no notice was given to the plaintiff of the intention to go round by sea, in order that he might insure. This is a different question from that of a breach of contract. If we did not give notice, it is a gravamen for which they ought to have declared specially. The case of *Max* v. *Roberts*, (12 *East*, 88,) shows that it was necessary for the plaintiff to aver that the defendant was bound to go through the canal. There is another objection which was not taken below ; but as it appears on the record, this Court will notice it. This action is by Baynes the consignor. The contract was to deliver to Davenport, the consignee, who alone had the right of action. *Griffith* v. *Ingledew*, (6 *Serg. & Rawle*, 429.) *Blymire* v. *Boistle*, (6 *Watts*, 182.) In the case of *De Medeiros* v. *Hill*, (3 *Carr. & Payne*, 182 ; S. C.

(Hand *v.* Baynes.)

24 *Eng. Com. Law Reps.* 268,) it was held, that under similar circumstances to the present, the jury were not bound to give the full value of the goods.

Mr. *Graham,* for the defendant in error.

The material question here is, did the defendant below contract to carry these goods by the way of the canal. The receipt, which is the only evidence of the contract, is express. The words " via the Chesapeake and Delaware Canal," amount to a promise to carry by that route. The plaintiff relied on this contract, and made no insurance. There was no such overruling necessity as is alleged on the other side. The defendant did not even give notice of his intention to go round by sea. The authorities are all in favour of the judgment of the Court below. In *Hadley* v. *Clarke,* (8 *Term Rep.* 259,) the defendants contracted to carry the plaintiff's goods from Liverpool to Leghorn ; on the vessel's arriving at Falmouth, in the course of her voyage an embargo was laid on her " until the further order of council ;" yet it was *held,* that the contract was not dissolved, but that even after two years, when the embargo was taken off, the defendants were answerable to the plaintiff in damages for the non-performance of their contract, (*Shubrick* v. *Salmon,* 3 *Burr.* 1637.) *Balfour* v. *Western,* (1 *Term Rep.* 310.) *Bullock* v. *Dommet,* (6 *Term Rep.* 650.) *Brecknock Co.* v. *Pritchard,* (6 *Term Rep.* 750.) 3 *Com. Abr.* 91, tit. *Condition.* The point respecting the right of action was not made below, and this Court, seeing that justice has been done by the verdict, will not reverse on this account, even if the law were more clearly with the defendant. But in fact it appears by the evidence, that Baynes was really the owner of the goods, and at all events could have stopped them *in transitu.* He was therefore liable to the carrier for the freight of them. *Davis* v. *James,* (5 *Burr.* 2680.) *Moore* v. *Wilson,* (1 *Term Rep.* 659.) *Sargent* v. *Morris,* (5 *Barn. & Ald.* 277 ; S. C. 5 *Eng. Com. Law Rep.* 283.) *Shephard* v. *De Bernall,* (13 *East,* 569.) In *Barker* v. *Havens,* (17 *Johns.* 234,) it was held, that the consignor was liable for freight if he owned the goods, which was the case here, and if liable for freight, he could sue for a breach of contract, in not delivering them.

The opinion of the Court was delivered by

ROGERS, J.—This was an action to recover the value of one hundred slaughter hides, shipped on board the Sloop Neptune, for Baltimore, via the Chesapeake and Delaware Canal. The suit is founded on a receipt in the following words :

"Philadelphia, January 14th, 1836.

Received on board Hand's Line for Baltimore, via Chesapeake and Delaware Canal, from J. Baynes, one hundred slaughter hides, on deck, which I promise to deliver to Joseph Davenport, at Balti-

more, the dangers of the navigation, fire, leakage and breakage excepted, he or they paying freight eight dollars, and porterage one dollar and fifty cents.                        H. HAND,
                                   Per H. H. ELDRIDGE."

This is a contract to carry the goods to the place of destination in a prescribed route. This construction of the contract, although not conceded to be correct, has been faintly denied. It cannot be pretended, that if a loss arises in an attempt to convey the goods by sea round Cape Charles, the owner would not be liable for the loss, unless they could show that the deviation arose from necessity. And yet the carriage by sea would be optional with the carrier, unless the route through the canal is parcel of the contract. There is no mistaking the intention of the parties to the contract. It is well known to shippers, that the navigation is less dangerous by the canal, than by the outward passage. The risk is so much diminished, that it supersedes, in a great measure, the necessity of insurance on the goods, which no prudent person would omit, if he should ship goods in the inclement season of the year, to be conveyed round the coast to the place of destination. And that there was a difference in the risk, was the impression of the owners of the vessel; for the advertisement of the 25th of March, presupposes the assent of the shippers to the alteration of the route, and the transfer of the goods to a vessel of a different description.

But it is said, that although the contract was to carry the goods by the way of the Chesapeake and Delaware Canal, yet the deviation from the prescribed route arose from necessity. The evidence does not show with precision, the nature of the obstructions which prevented the passage of the vessel through the canal, but it sufficiently appears, that they were of the ordinary kind, and of a temporary nature. When the master discovered the impediments to the prosecution of the voyage, through the route called for in the contract, his duty was plain; he had one of two courses to pursue: to remain in a place of safety at the mouth of the canal, or in some convenient and safe place in the neighbourhood, until the obstructions were removed; or he should have returned and informed the owners and shippers, of the impracticability of proceeding through the canal. The legal effect of the contract, is an engagement to deliver the goods at Baltimore, in a reasonable time; and what would be a reasonable time must be determined under all the circumstances, with a view to the condition of the canal, the season of the year, the state of the weather, and such other matters as might enter into the question. If either of these courses had been pursued, and the shipper had brought suit for a breach of the implied contract to deliver the goods in a reasonable time, the condition of the canal at the time, would have entered materially into the question. But notwithstanding this, the case of *Hadley v. Clarke*, (8 *T. R.* 259,) shows that a temporary obstruction only suspends, but does not

(Hand *v.* Baynes.)

dissolve the contract. These principles apply to an implied contract: but suppose the contract to be express, as to deliver the goods in a prescribed time; would any temporary obstruction, or the impossibility of complying with the engagement, arising from the condition of the locks on the canal, or any other cause, be a defence to a suit for failure to perform the contract? It is very clear that it would not. When the law creates a duty or charge, and the party is disabled to perform it, without any default in him, and hath no remedy over, then the law will excuse him; but when the party by his own contract creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract. This distinction is founded in reason and authority. *Alleyn,* 27. *Hadley* v. *Clarke,* (8 *T. R.* 259.) *The Company of Proprietors of the Brecknock and Abergaveny Canal Navigation* v. *Pritchard and others,* (6 *T. R.* 750.) But it has been urged, that varying from the usual course of a voyage, in the case of an insurance, or any extraordinary delay, may be justified by necessity; that the master is the common agent of the concerned, and that it is his duty to manage their interests according to his best judgment; and that when he acts with good faith, and according to his best judgment, all parties, insurers as well as others, are bound by his acts. And this is correct, when applied to implied covenants; but when the covenant is express, it must be strictly complied with. Thus, in addition to the authorities above cited, there are others, as between insurers and insured. Thus in *Shubrick* v. *Salmon,* (3 *Burr.* 1637,) Lord MANSFIELD says, the distinction between implied covenants, by operation of law, and express covenants, is, that express covenants are taken more strictly. *De Hahn* v. *Hartley,* (1 *T. R.* 343,) is to the same point. It was an action upon promises, brought by an underwriter to recover back the amount of a loss which he had paid upon a policy of insurance. It was held, that whatever is written on the margin of a policy, is a warranty and must be literally complied with. It has also been ruled, that if a ship warranted to sail on or before a particular day, be prevented from sailing on the day by an embargo, the warranty is not complied with. *Horn* v. *Whitmore,* (2 *Cowp.* 784.) *Paxson* v. *Watson,* (2 *Cowp.* 785.) The Court are further of the opinion, that the clause in the receipt, "the dangers of the navigation," does not apply to dangers caused by the canal's being, by inevitable accident, rendered impassable. Occasional interruptions of trade, arising from breaches in canals, or other accidents, are inconveniences, but in no sense can they be considered as dangers of the navigation, coming within the exception. The contract excepts the dangers by the navigation on the route of the canal, and when there may be such a danger as is provided for, it will be time enough to decide when it arises. By an alteration of the voyage, the shipper was exposed to risks which he

would not have voluntarily encountered. The voyage by sea requires vessels of a different description, differently found, and differently manned; and although the shipper may have been willing to encounter the peril, in a vessel adapted to the trade, it does not follow that he would risk his property in a vessel whose ordinary route was through the canal. He should not be exposed to the increased risk without his consent, and without the opportunity of effecting an insurance on his property.

But it is said that the Court took the facts from the jury. It appears from the record, that after the testimony was closed, the counsel for the plaintiff insisted, that the plaintiff was in law entitled to recover, and the counsel for the defendant insisted, that in law the plaintiff was not entitled to recover, and both parties requested the Court *so* to charge the jury. Both parties agreed to, or at least, did not dissent from, the course pursued by the judge, who directed the jury to find for the plaintiff, subject to the opinion of the Court on all the points of law in the case, or upon the facts given in evidence. On the argument they have had the full benefit of all the facts and the inferences which the jury might draw from them, and we do not conceive, that the justice of the case requires, that the cause should be remanded on that ground.

But can the consignor sustain the suit? This exception, after a full trial on the merits, is not entitled to much favour; and we might be excused from noticing it altogether, as the exception does not appear as one of the errors assigned. The plaintiff in error relies on *Griffith* v. *Ingledew*, (6 *Serg. & Rawle*, 429.) There A. of Liverpool shipped goods which by the bill of lading were to be delivered to B. or his assignees in Philadelphia; the goods belonged to A., and the freight was payable in Liverpool; and it was held, that the bill of lading vested the property in the consignee, who might maintain an action in his own name against the ship-owner, for the negligent carriage of the goods. That suit was decided on the ground that the bill of lading vested the legal property in the consignee and that for the purpose of deciding the legal property, the Court would look to the face of the bill of lading. But this is not a bill of lading but a contract between the consignor and the carrier, and in actions against common carriers, the general principle is, that the right of action is attached to the property. There is nothing to show that Davenport is the owner of the goods, but it was in proof that Baynes was the owner. The receipt contains a contract with Baynes, to deliver the goods to Davenport, but whether as agent or vendee, does not appear. Baynes would be liable to payment of freight as is held in *Barker* v. *Havens*, (17 *Johns.* 234.) *Shepherd* v. *De Barnales*, (13 *East*, 565.) The case of *Davis & Jordon* v. *James*, (5 *Burr.* 2680,) is very like the present. That was an action against a common carrier for not delivering goods sent by him. The only

question was, in whose name the action ought to have been brought. It was held, that the action well lies against the carrier in the name of the consignor.   And in *Moore and Others* v. *Wilson*, (1 *T. R.* 659,) it is held, that in an action by the consignor of goods, against a carrier, for non-delivery, where the plaintiff averred that the defendant undertook to deliver, &c. in consideration of the hire to be paid by the plaintiff, proof that the hire was to be paid by the consignee, was held to be no variance, the consignor being in law liable.   BULLER, before whom the cause was tried, non-suited the plaintiff; but on considering the question, found he was mistaken in point of law; for that, whatever might be the contract between the vendor and vendee, the agreement for the carriage was between the carrier and the vendor, the latter of whom was by law liable.   And the other two judges being of the same opinion, the rule was made absolute.   So also *Vale* v. *Bayle*, (*Cowp.* 294,) to the same point.   The case of *Davis* v. *Peel*, (8 *T. R.* 330,) was decided on the principle that the consignee was the owner of the goods, and in such a case, the action can only be brought by the consignee, unless there is some special agreement between the consignor and the carrier.   But in cases where the right of property is not divested, the consignor can maintain a suit, for he is the person who has sustained the loss, if any, by the negligence of the carrier; and whoever has sustained the loss is the proper party to call for compensation, from the person by whom he has been injured.

We are of opinion that the plaintiff is entitled to judgment; and that the proper measure of damages is the value of the goods.

Judgment affirmed.