### CHARLES MORGAN v. DIBBLE & SEELIGSON.

By the contract of affreightment of goods from port to port, the carrier stipulates not only for their safe transportation to the place of destination, but also for their delivery on arrival to the consignee. It is not enough if he carry the goods in safety, but he must, in due time, and without demand upon him, deliver them, or do that which in contemplation of law is tantamount thereto, before he is discharged from his responsibility as carrier.

Since one engaged in carrying goods by water from one port to another is

not ordinarily supposed to have the means of transporting them inland, unless the contrary appear from the contract, or from established usage, the customary wharf for discharge of the vessel must be regarded as the place of delivery.

It is not to be supposed, however, unless it be clearly shown by special agreement or well-known usage, that the mere landing of goods upon the wharf is such a delivery as will discharge the carrier.

But, though the contract does not require the owners of the vessel to deliver goods at any other place in the port than the usual place of discharge, it is not to be considered that they have the right to land the goods at those places, and release themselves by doing so from all further care and responsibility, without giving notice to the person who is to receive them.

Persons to whom goods are sent may be absent from the port when the ship reaches it; they may be disabled by sickness from attending to their business; they may not be informed of the arrival of the vessel. Under such circumstances, or many others similar that may be supposed, it would be extraordinary, indeed, if the carrier were authorized to throw the goods on shore, where they could not fail to be exposed to injury from the weather, and could not fail to be stolen. Contracts impose on parties not merely the obligations expressed in them, but every thing which, by law, equity, and custom, is considered as incidental to the particular contract, or necessary to carry it into effect.

Delivery is not merely an incident to a contract of affreightment, it is essential to its discharge; and as there cannot be a delivery without the act of two parties, it is indispensable that the freighter should be apprized when and where the ship-owner, or his agent, is ready to hand over the goods.

The carrier, while the goods remained upon the wharf, was still in charge of them as a carrier, and responsible in this capacity for their safety. And if there was either negligence or the want of due foresight and prudence in placing them there, under the circumstances he was responsible for their loss, although it was subsequently occasioned by the immediate "act of God," unless it clearly appeared they would have been destroyed by the same peril, if there had been no failure of duty by the carrier. The question of diligence was one of fact, to have been determined by the jury upon the evidence before them.

APPEAL from Calhoun. The case was tried before Hon. J. J. HOLT, one of the district judges.

Augustus L. Dibble and Henry Seeligson sued Charles Morgan for $1,100, the value of an invoice of goods shipped on Morgan's steamer, "Harlan," on the 10th of July, 1866, to be delivered at Indianola, upon the usual bill of lading. It was charged, that Morgan was a common carrier, and

he was—in fact had been for many years—the owner of the great line of steamers from New Orleans to the gulf ports of Texas.

The line of defense was, that his steamers were carriers of the mails of the United States; that the times of the arrivals and departures of his vessels were well known; that the Harlan, with the consignment, made the trip in the regular time, and landed at Indianola on the 14th of July, 1866, at 8 o'clock a. m., of which the plaintiffs had notice, and that the goods were delivered to them by 12 o'clock on that day, but, according to custom, the goods were delivered on the wharf, for the discharge of cargoes; that the goods were so delivered, and that they were afterwards lost by a storm, on the same day on which the hurricane drove the sail-vessels in the bay against the wharf, and precipitated the wharf and goods into the bay. The plaintiff proved the invoice and bill of lading, and that he did not receive the goods, though they might have been delivered on the wharf without his knowledge. It was proved that the goods were landed upon the wharf; that the vessel commenced discharging about 9 o'clock; that it commenced raining a little after that hour, and continued to rain all day. There was some difference in the evidence as to the custom about delivery. Some of the witnesses say that the vessel took care of them until they could be delivered in safe weather; and there was some difference as to the threatening character of the weather when the vessel arrived, though all agreed that the rain commenced soon thereafter, and continued, until the storm drove a sail-vessel against the wharf and destroyed the goods. The "Harlan" lay at anchor in safety.

The following were the facts deduced by the appellants' counsel from the statement of facts, and which were the strongest in his favor:

"This suit was brought by the appellees against the appellant, as a common carrier, for the value of an invoice

of goods, to be delivered at the port of Indianola. The goods were shipped on the steamer Harlan. The vessel commenced the voyage in accordance with the contract of affreightment, and completed it in the usual time. She arrived at the .port of destination about 8 o'clock in the morning of July 14, 1866. She was one of a line of steamers carrying the United States mails. It was the uniform custom with the owners of this line, and well known to, and acquiesced in by, the community, to discharge the cargoes of these vessels on the wharf, immediately on their arrival in port. In the case at bar, this was done and completed by 1 o'clock p. m.

"It was also customary for the goods landed on the wharf to be left there till called for by the owners or consignees. In that case they.were covered over with tarpaulins by the agent of the carrier.

"The wharf was the warehouse of.this line of steamers, but no charges were made by the owners of the line for storage or services in taking care of the goods until their delivery. The wharf was in.good condition.

"The goods would not have been destroyed had not a vessel been driven through the wharf by a violent hurricane. The wind commenced blowing a hurricane about half-past 1 o'clock in the morning of the 15th. The destruction of the goods commenced about 4 o'clock a. m."

As the case seemed to have turned upon the 9th instruction, it is here given in full:

"A landing of goods on an open wharf, with a warehouse on it, in bad, rainy weather, and when a storm is apparently imminent, (and really does ensue,) is not such a delivery by law as would release the carrier from responsibility; but, on the contrary, is, *prima facie*, evidence of willful negligence on his part; and if the goods are subsequently swept away from said wharf and lost, the carrier would be liable, unless the consignee had an opportunity to take them away."

The jury found a verdict for the value of the goods. The defendant moved for a new trial, on the ground of objections to a number of instructions, which motion was overruled, and the defendant appealed, and assigned as error these same instructions. The question turned upon the legality of the delivery upon the wharf during rainy and threatening weather.

*A. H. Phillips*, for appellant.—The goods were lost because of, the direct and immediate "act of God." By this expression we mean, in the language of the books, "accidents produced by physical causes which are irresistible; as, for example, winds and storms, or a sudden gust of wind, by lightning, inundations, or earthquakes, sudden death or illness, are occasioned by the 'act of God.'" (Chit. on Car., sec. 36; 1 Pars. on Mar. Law, 180; 2 Sum., 567; Edw. on Bail., 454, 455, 456, 457; 2 Tex., 123; 12 How., 272.)

From the facts thus presented we respectfully submit to the court, that the goods when lost were not in the hands of the appellant as a "common carrier," but as a warehouse-man. In that case the action was misconceived; all the charges of the court were inapplicable; hence the judgment should be reversed and the cause dismissed. (N. & P. Co. v. B. & M. R. R., 2 Gray, 263.)

But suppose otherwise; then we say the carrier is excused under the law, because the loss was occasioned by the act of God.

The authorities already cited above establish this position. On this point we may also refer the court to Story on Bailments, 516, 517, p. 332, 333, 334; 10 Johns., 1; 11 Johns., 107.

It may be admitted that when a loss occurs by the act of God, accompanied by negligence on the part of the carrier, he is not excused from liability; but to the application of this rule to the case at bar we have several answers to make.

In the first place, the charge as made admits the agency

of an irresistible force; yet the facts in this case show no connection whatever between the negligence charged and that "irresistible force." It is asserted that the "negligence" was the act of landing the goods on an open wharf on a rainy day. But the goods were not lost through the agency of rain. And although the weather was unsettled and threatening, as one witness states, another says, and he a sea captain, too, "that there were no indications of such as followed;" meaning a hurricane of wind.

But there is another answer to the "plea of avoidance" to the defense of the appellant. Negligence is a question of fact for the jury. (6 Johns., 161–164.)

It is further respectfully submitted, that the eleventh instruction of the court was erroneous.

The public was fully aware of the obligations of the owners of this line of steamers under their contract to carry the United States mail. It was well known, too, that, in consequence of this obligation, a different custom prevailed with this line of steamers, as to the discharge and delivery of freight, from that which was usual with sail and other vessels. This custom, being well understood, constituted one of the laws of the contract of affreightment. Hence a time of discharge and mode of delivery of a cargo might be legal as to these steamers, that might not be so with regard to other vessels. The proof shows that this was the fact at the port of Indianola. (Story on Bail., § 543; Fland. on Ship., 277.)

In the second place, we call the attention of the court, in this connection, to those portions of the evidence tending to show that the loss was occasioned by the direct and immediate agency of an irresistible force. When the loss can be attributed as well to the perils of the sea as to negligence, the carrier will be excused. (Clark v. Barnwell, 12 How., 280, 281.)

Again: Did not the owners virtually and in fact consent to the landing of the goods at the time? All knew of the

arrival of the vessel, and that it was customary to discharge her cargo without delay, whether on a week day or on Sunday, in the daytime or at night. Not a single owner or consignee protested against this negligence of landing the goods on such a wet day. (Fland. on Ship., 273; Pars. on Mer. Law, 186.) By these authorities the parties would be concluded, apart from any custom on the subject.

*Glass & Crosland* and *D. C. Proctor*, for appellee.—The goods must have been delivered at the usual time and place, and in good weather. (1 Pars. on Cont., 658; Add. on Cont., 798; Fland. on Ship., § 273; Ang. on Car., § 323; 1 Pars. on Mer. Law, 152, 153, 154, 155, 156; Ostrander v. Brown, 15 Johns., 39; Hemphill v. Chenie, 6 Watts & Serg., 62; Gibson.v. Culver, 17 Wend., 305; Fisk v. Newton, 1 Denio, 45.)

The goods must be landed and the consignee notified. (Ang. on Car., § 313; 1 Pars. on Cont., 668, 669; Kohn v. Packard, 3 La., 225.)

And they must be separated from the goods of others. (1 Pars. on Mer. Law, 153; Ang. on Car., § 287; Brittain v. Barnaby, 21 How., 532.)

The consignee must have an opportunity to examine his goods. (1 Pars. on Mer. Law, 155; Hemphill v. Chenie, 6 Watts & Serg., 66.)

If the consignee is dead, or refuse to receive goods consigned, it is the duty of the carrier to place them in a warehouse, or other place of safety. (Ang. on Car., § 291; 1 Pars. on Cont., 659; Ostrander v. Brown, 15 Johns., 39; Fisk v. Newton, 1 Denio, 45.)

The act of God is such inevitable peril as no human foresight could prevent. (Ang. on Car., §§ 154, 167; Chevallier v. Strahan, 2 Tex., 119.)

The ninth instruction is correct as a principle of law, and in strict accordance with the proof. (Ang. on Car.,

§ 327; 2 Kent's Com., 602; Pars. on Mer. Law, 215; Clark v. Barnwell, 12 How., 272.)

The evidence of nearly every witness was positive to the fact that the goods were landed on the wharf in bad weather, raining to a degree preventing their removal, without notice to the consignees, and when a storm was imminent, and without an opportunity being afforded the consignees of receiving the goods; that they were promiscuously placed upon the wharf in piles; that there was no warehouse on the wharf; and further, that if proper attention had been given these goods, even after their landing on the wharf, they might have been saved.

The character of the weather at the time of the arrival of the steamer at the port of Indianola, and the discharge of her cargo without intermission during such weather as is detailed by the witnesses, show, as we believe, beyond doubt, that the landing of the goods by the carrier proved the grossest negligence on his part; and, such being the fact, legitimately deduced from the testimony, even if the goods were lost by the "act of God," it having resulted as a consequence of the gross negligence of the carrier, he will by law be held liable. (Story on Bail., 332, 334; Chevallier v. Strahan, 2 Tex., 124; 2 Greenl. Ev., 219; Abb. on Ship., 500; 3 Kent's Com., 216, 217; Ang. on Car., § 163.)

In support of the eleventh instruction, we submit the elementary principle, that a common carrier is bound to deliver goods intrusted to him against all events but the "act of God" and public enemies. (Ang. on Car., §§ 46, 67, 148, 282; Chevallier v. Strahan, 2 Tex., 119; Philleo v. Sandford, 17 Tex., 230; Arnold v. Jones, 26 Tex., 335.)

The owner of goods is entitled to recover the net value of the goods at the place where and at the time when they should have been delivered. (Ang. on Car., § 482; Quadras v. Steamer Daniel Webster, 11 La. Ann., 203; Grieff

v. Switzer, 11 La. Ann., 324; Fowler v. Davenport, 21 Tex., 626.)

The conduct of the carrier was a question for the jury, and to be by them determined from attendant circumstances, and their verdict declares that there was *laches* and negligence on the part of the carrier, to which the law fixes the penalty. And, even should the statement of facts show a conflict of testimony, this court will not disturb the verdict, if there be evidence tending to support it. (Carter v. Carter, 5 Tex., 102; Latham v. Selkirk, 11 Tex., 321; Howard v. Ray, 25 Tex., 88; Adams v. George, 25 Tex. Supp., 374; Fowler v. Lewis, 25 Tex. Supp., 380.)

Not having an opportunity to see the brief of appellant, previous to the compilation of the foregoing, the appellees respectfully submit, in addition, the following:

The custom at the port of Indianola, which the appellant claims to have complied with, is shown by the proof to have been entirely different from the manner of delivery in this case.

A custom of the carrier, special to himself, to govern the mode of delivery, is an unheard-of thing in the books. Custom, as referred to by them, is a custom of merchants at the place. (Flan. on Ship., 277; Ang. on Con., §§ 301, 316; 21 How., 532.)

The goods we claim were not lost by the "act of God," which is defined to be "accidents produced by physical causes which are irresistible," &c. The proof in this case shows, that if proper care had been taken of the goods they would all have been saved, and if moved fifty feet either way could have been saved. Appellant had no one there to attend to them, even when others were ready and proffering to assist in saving them.

"No force however great, no accident however inevitable, no fraud beyond his control, will excuse the carrier." (Cook v. Gourdin, 2 Nott & McCord, 19; Story on Bail., §§ 509

to 512; Chevallier v. Strahan, 2 Tex., 119; Pars. on Mer. Law, 213, 214.)

The liability as carrier continues until a delivery or the goods have been warehoused.

That negligence is a question of fact, to be found by the jury, will not affect instruction No. 9, objected to.

The charge only proposed to give a legal definition of negligence, as applied to the facts proved, and in no manner took away from the jury the utmost liberty in finding the facts.   The facts which entered into the legal definition of negligence were found by the jury, and their verdict was in no manner affected by the charge.   The authority (6 Johns., 160,) quoted by appellant, fully sustains the legality of the charge.   Even should the charge alone be considered exceptionable, yet we claim it is too late now for appellant to object, as he should have asked such instructions as he wished.   (Chamblee v. Tarbox, Austin T., 1864, [27 Tex., 139;] 14 Tex., 16, 30, 593.)

The charge must be erroneous on an important point, or the verdict will not be disturbed.   (Bailey v. Mills, 27 Tex., 434.)

If, upon the whole, the charge is as favorable as the party had a right to ask, the judgment will stand.   (Mercer v. Hall, 2 Tex., 284.)

The policy of our statutes relative to carriers is to hold them strictly to their common-law liability, and such being the case, a different rule should not govern this court in the decision of this cause.   (Act December 4, 1863; Paschal's Dig., Art. 452, Note 329.)

MOORE, C. J.—Although the questions in this case are fully settled by well-established rules of commercial law, and by the decisions of courts of the highest authority, as they involve points of considerable importance to the mercantile community, and those engaged in the business of

common carriers, we have endeavored to give them the full attention which they merit, and will now, though without elaboration, indicate the conclusions at which we have arrived, and which we hold to be sustained by elementary principles and well-considered decisions.

That the appellant was engaged in the business of a common carrier is not disputed, and that he was liable to the full extent of responsibility which the law attaches to those engaged in such business in respect to the goods, on account of which this suit is brought, is unquestionable. By the contract of affreightment of goods from port to port, the carrier stipulates not only for their safe transportation to the place of destination, but also for their delivery on arrival to the consignee. It is not enough if he carry the goods in safety, but he must, in due time and without demand upon him, deliver them, or do that which in contemplation of law is tantamount thereto, before he is discharged from his responsibility as carrier. (2 Kent, 604; Eagle v. White, 6 Whart., 505; Gilson v. Culver, 17 Wend., 305; Erskin v. Thomas, 6 Miss., 371.)

Since one engaged in carrying goods by water from one port to another is not ordinarily supposed to have the means of transporting them on land, unless the contrary appear from the contract or from established usage, the customary wharf for discharge of the vessel must be regarded as the place of delivery. (Story on Bail., § 544.)

It is not to be supposed, however, unless it be clearly shown by special agreement or well-known usage, that the mere landing of goods upon the wharf is such a delivery as will discharge the carrier. (Ostrander v. Brown, 15 Johns., 39; Hemphill v. Cherrie, 6 Watts & Serg., 62; Galloway v. Hughes, 1 Bail., 553.)

In Kohn v. Packard, 3 La., O. S., 227, it is said: "But though the contract does not require the owners of the vessel to deliver goods at any other place in the port than the usual places of discharge, it is not to be considered that

they have the right to land the goods at those places, and release themselves by doing so from all further care and responsibility, without giving notice to the person who is to receive them."

And it is also well said: "Persons to whom goods are sent may be absent from the port when the ship reaches it; they may be disabled by sickness from attending to their business; they may not be informed of the arrival of the vessel. Under such circumstances, or many others similar that may be supposed, it would be extraordinary indeed if the carrier were authorized to throw the goods on shore, where they could not fail to be exposed to injury from the weather, and could not fail to be stolen. There could be little difference in such an act and any other that would occasion their loss. Contracts impose on parties not merely the obligations expressed in them, but everything which, by law, equity, and custom, is considered as incidental to the particular contract, or necessary to carry it into effect.

"Delivery is not merely an incident to a contract of affreightment, it is essential to its discharge; and as there cannot be a delivery without the act of two parties, it is indispensable that the freighter should be apprized when and where the ship-owner or his agent is ready to hand over the goods."

That he has such information, may be shown either by proof of express notice brought home to him, or by circumstantial evidence, from general custom and usage, or other facts sufficient to raise the presumption against him.

The evidence in this case clearly establishes the fact, that the usage of the port where appellee's goods were to be delivered agrees with the ordinary undertaking of carriers by water, and fixes the wharf where appellant's vessels are accustomed to discharge as the place for the delivery of the goods. But whether, by the custom and usage of the trade, and from the usual arrival and departures of appellant's vessels according to their schedule as mail-boats, or from

any other circumstances, the consignee was also bound to take notice of the time of arrival of the ship bringing his goods, is more questionable. It is a fact usually for the consideration of the jury, but its practical determination is unimportant in the present case, for, as we shall see, if appellant is exonerated from liability for the loss of the goods, it is on account of their destruction by "act of God" or "peril of the sea," which could not be guarded against by human skill or foresight.

The goods must also be tendered in a proper time and manner, as well as place, to relieve the carrier from responsibility. Hence it must be within business hours, and under such circumstances that the consignee may receive and put his goods away consistently with their safety. And it is the duty of the carrier to hold the goods in his custody until this may be done, and while he does so he continues to hold them under his responsibility as carrier. (Bowman v. Teale, 23 Wend., 306; Hill v. Humphreys, 5 Watts & Serg., 123.) If the consignee be absent or refuse to receive them, he should place them in a warehouse or other place of safety. (Ostander v. Brown, 15 Johns., 39; Fish v. Newton, 1 Denio, 45.)

In the application of these principles to this case, it is necessary to determine whether the appellant was justified, under the circumstances existing at the time, in placing the goods upon the wharf for the purpose of being delivered; for all the testimony in the record is to the effect, that by the usage of the trade goods were not regarded by the carrier or consignees as delivered until they were checked off by the agent of the former to the draymen. It is also beyond reasonable question, that the weather during the day on which the goods were landed was not such as was suitable for their reception by appellee, and he was, therefore, if apprized that they were upon the wharf, under no obligation to receive them. Appellant, while the goods remained upon the wharf, was still in charge of them as a

carrier, and responsible in this capacity for their safety. And if there was either negligence or the want of due foresight and prudence in placing them there under the circumstances, he was responsible for their loss, although it was subsequently occasioned by the immediate "act of God," unless it clearly appeared they would have been destroyed by the same peril if there had been no failure of duty by the carrier. (Crosby v. Fitch, 12 Conn., 410; Williams v. Grant, 1 Conn., 487; Olur v. Maryland Insurance Co., 7 Cranch, 497; Hard v. Baynes, 4 Whart., 204.)

This question, however, was one of fact, to have been determined by the jury upon the evidence before them. (Colt v. McMichen, 4 Johns., 160; Elliott v. Rossell, 10 Johns., 1.) And we think, therefore, that the ninth instruction given by the court is properly objected to, as trenching upon the province of the jury in this particular, if it were intended to instruct the jury that appellant had been in point of fact guilty of gross negligence; and, if intended to indicate facts from which the law inferred negligence, we are of the opinion that in the manner the charge is expressed it was calculated to mislead them.

The testimony shows that the wharf was in good condition and secure, except against inevitable accident; that the goods were protected by tarpaulins from the rain, and there was evidence tending to show that it was the general custom, from the fact that appellant's vessels carried the mail, to discharge their freight immediately on their arrival, either in the day or night, in good or bad weather. And, while all the witnesses concurred as to the general state of the weather, yet some represent it as much more threatening than others.

It should have been left, as a question of fact, therefore, upon all the evidence in the case, to the jury to say whether there was negligence on the part of the appellant's agents in unloading the vessel in such weather and under such circumstances as it was done. If it were not, they

should then have been directed to the same inquiry with reference to the care and diligence used for the preservation of the goods after they had been placed upon the wharf and they were being destroyed by the injury to the wharf from the vessel driven through it by the storm, and when, it seems from the testimony, a large portion of them, at least, might have been saved, if any exertion had been made for that purpose. For, as we have said, the goods were still in appellant's possession as a carrier; and, although they were destroyed by the immediate "act of God," if they might have been saved, nevertheless, by the use of foresight and prudence, after there was reason to apprehend this danger, he would not be excused.

The rule in respect to the measure of damages was, we think, correctly laid down by the court. (Sug. on Meas. of Dam., 370; Ludwig v. Meyer, 5 Watts & Serg., 435.)

The judgment is reversed, and the cause

REMANDED.