## THE CALEDONIA.[1]

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

No. 107.  Argued December 12, 13, 1894. — Decided March 11, 1895.

In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy ; and this being so, his undertaking is not discharged because the want of fitness is the result of latent defects.

A bill of lading whereby a steamship owner undertakes to deliver live cattle at a foreign port, loss or damage from delays, steam boilers and machinery or defects therein excepted, does not exempt him from liability under such warranty for injury happening to the cattle through an unexpected prolongation of the voyage, in consequence of a breaking of the shaft caused by a latent defect in it, which existed before and at the commencement of the voyage.

Exceptions in a bill of lading are to be construed most strongly against the shipowner; and when they form, in the contract, part of long enumerations of excepted causes of damage, all the rest of which relate to matters subsequent to the beginning of the voyage, they must be treated as equally limited in their scope.

As between the shipper and the shipowner, the bill of lading only can be considered as the contract.

[1] The docket title of this case is " James Henderson *el al.*, Claimants of the Steamship Caledonia, *v.* Goldsmith."

THIS was a libel in admiralty by a shipper of cattle against the steamship Caledonia to recover damages caused by the breaking of her shaft. The District Court decreed in favor of libellant, 50 Fed. Rep. 567, and claimants appealed. The Circuit Court found the following facts and conclusions of law:

"This was a libel in admiralty, in a cause of contract, civil and maritime, by a shipper of cattle against the steamship Caledonia, to recover damages caused by the breaking of her shaft.

"The Caledonia was one of the Anchor line of transatlantic steamships, owned and employed by the claimants, Henderson Brothers, as common carriers. The plaintiff was a dealer in and exporter of cattle.

"The terms of the contract between the parties were as expressed in the following memorandum of agreement, made before the shipment of the cattle, and in the following bill of lading signed at the time of shipment, and afterwards accepted by the libellant:

"'*Memorandum of Agreement.*

"'Concluded at New York, the twenty-fifth day of May, 1885, between Messrs. Henderson Brothers, 7 Bowling Green, New York, agents of the steamer Caledonia, hereinafter described as the party of the first part, and Mr. M. Goldsmith of New York, hereinafter described as the shipper of the second part.

"'The agents of the steamer agree to let to said shipper suitable space, as under noted, for the transportation of live cattle, that is to say: On the steamship Caledonia, for about two hundred and seventy-five to three hundred head of cattle on and under decks. Steamer expected to sail from Boston for London about eleventh of June. The agents agree to fit the stalls in the style customary at the port of Boston, to the satisfaction of inspectors of Boston insurance companies, and the shipper, who will assume all responsibility for same, and for various appliances of ventilation, after shipment of the cattle; and the steamer Caledonia undertakes to supply sufficient good condensed water for the use of the animals during

the voyage.   All water casks, buckets, hose and similar appli-
ances must be put on board by shipper of the cattle.

"'A reasonable supply of fodder for the animals will be car-
ried by the steamship Caledonia, free of freight: but freight
if demanded shall be payable on any unusual excess of fodder
landed at port of destination.   Hay and straw to be in com-
pressed bales.

"'The steamer Caledonia will also furnish free steerage pas-
sage for attendants (not exceeding one man to every thirty
cattle) over, and return, providing them with the necessary
utensils for the voyage.

"'The agents of the steamer agree to notify the said ship-
per, at least six days in advance, of the intended departure of
the steamship, and, twelve hours prior to sailing, of the day
and hour.   In event of shipper failing to deliver the cattle to
steamship within twenty-four hours after expiry of due notice,
as aforementioned, steamer is to have liberty to sail, and
freight is to be paid in full by the party of the second part.

"'The steamer Caledonia agrees to deliver the cattle at Dept-
ford, and the shipper agrees to bear tonnage, dock or shed dues
when incurred.   The cattle are to be delivered and received
from steamship's decks immediately on arrival at the port of
destination.

"'The shipper agrees to ship all the cattle the steamship
can carry as above mentioned, paying freight on same at the
rate of forty-five shillings British sterling per bullock, for all
cattle shipped.

"'The shipper agrees to prepay freight on the above-men-
tioned shipments in current funds at first-class bankers, selling
rate for sight exchange, on the number of cattle shipped at
Boston, vessel lost or not lost, and irrespective of the number
landed at the port of destination; and the shipper assumes
all risk of mortality or accident, however caused, throughout
the voyage.

"'The shipper agrees to deliver the cattle on the date and
hour ordered by the agents of the steamer, or pay demurrage
of the steamship for all, or any detention incurred by his
failure to do so.

" ' In case of non-arrival of vessel in time to sail from Boston, on or before 18th June, shipper has option of cancellation. Any dispute arising on this contract to be settled by arbitration in the usual way in Boston.

" ' HENDERSON BROTHERS.'

## " ' *Cattle Bill of Lading.*

" ' Shipped alive, by M. Goldsmith, and at shipper's risk, in and upon the steamship called the Caledonia, now lying in the port of Boston and bound for London, two hundred and seventy-four head live cattle, to be delivered from the ship's deck at the aforesaid port of London; the act of God, the Queen's enemies, pirates, restraint of princes and rulers, perils of the seas, rivers, navigation and land transit, of whatever nature or kind, restrictions at port of discharge, loss or damage from delays, collision, straining, explosion, heat, fire, steam boilers and machinery or defects therein, transshipment, escape, accidents, suffocation, mortality, disease or deterioration in value, negligence, default or error in judgment of pilots, master, mariners, engineers, stevedores, or any other person in the employ of the steamship or of the owners or their agents, excepted; with liberty to sail with or without pilots, to tow and assist vessels in all situations, to call at any port or ports to receive fuel, load or discharge cargo, or for any other purpose; and in the event of the steamship's putting back to Boston or into any other port, or being prevented from any cause from proceeding in the ordinary course of her voyage, to transship by any other steamer unto order or to his or their assigns.

" ' Freight for the said stock to be paid without any allowance of credit or discount, at the rate of £2. 5. 0. sterling for each animal shipped on deck, and £2. 5. 0. sterling for each animal shipped under deck, whether delivered or not, vessel lost or not lost, cattle jettisoned in all or in part, or otherwise lost, with average accustomed. In the event of the loss of the vessel, of her not arriving at the said port, or of the consignee neglecting to pay the freight upon the arrival of the vessel, or neglecting to pay the charges and expenses herein men-

tioned, the shipper, in consideration of the waiving of the payment of the freight in advance, hereby binds and obligates himself to pay the freight above expressed, and such charges and expenses upon demand.

"'It is also stipulated and agreed by the shipper, as a condition of the shipment, that he will take charge of the stock during the voyage, the vessel furnishing water only ; that he has examined the condition of the steamer, the construction of the stalls and the means of ventilation, and approved of the same, and that no claim shall be made for any loss or damage resulting therefrom ; that any mortality, sickness or deterioration in the condition of the stock shall be presumed to arise from the condition of the animals when shipped, or from natural causes.

"'Consignees to enter the property at the custom-house within twenty-four hours after the ship is reported there, and to remove the same immediately upon being landed, otherwise the property may be discharged by the agents of the ship at the expense and risk of the shipper or consignee of cargo. Porterage of the delivery of the cargo to be done by agents of the ship, at the expense and risk of the receivers. Lighterage, tonnage and shed dues payable by the receivers. This bill of lading, duly endorsed, to be given up to the ship agents, in exchange for delivery order.

"'In witness whereof, the master, purser, or agents of the said ship hath affirmed to three bills of lading, all of this tenor and date, one of which bills being accomplished, the others to stand void.

"'In accepting this bill of lading, the shipper, as owner, or agent of the owner of the property shipped, expressly accepts and agrees to all its stipulations, exceptions, and conditions, whether written or printed.

"'Dated in Boston, Mass., 15th June, 1885.

"'J. MILLER STEWART,
"'*For the Agents.*'

"On Monday, June 15, 1885, the libellant shipped on board the Caledonia at Boston, to be delivered at Deptford, two

hundred and seventy-four head of cattle in good order and condition; and put on board fodder sufficient for a voyage of fifteen days (a day or two more than the usual length of voyage), being all the fodder that by the usage of the business he was bound to provide. On the morning of June 24, the ninth day out from Boston, in smooth weather, the propeller shaft of the Caledonia broke straight across in the stem tube. There had been no heavy weather on this voyage, and the propeller did not strike against any rock or derelict or other object. The cause of the breaking of the shaft was its having been weakened by meeting with extraordinarily heavy seas on previous voyages. At the time of leaving Boston on June 15, the shaft was in fact unfit for the voyage, and by reason of its unfitness the vessel was unseaworthy. No defect in the shaft was visible or could have been detected by the usual and reasonable means, if the shaft had been taken out and examined. No negligence on the part of the owners of the steamship was proved.

" By reason of the breaking of the shaft, the voyage lasted twenty-five days, and the cattle were put on short allowance of food, and in consequence thereof were landed at Deptford in the afternoon of Monday, July 20, in an emaciated condition.

" The market days in London were Mondays and Thursdays. By the usual course of the business of shipping live cattle from Boston to Deptford for the London market, and, in accordance with the knowledge and contemplation of both parties at the time of the execution of the memorandum of agreement and the bill of lading, the cattle were not to be sold before arrival, and were sold at the first market after their arrival.

" The amount of the damages suffered by the libellant was as stated in the following agreement, signed and filed by the counsel of the parties :

" ' It is hereby agreed that the whole amount of damages suffered by the libellant (exclusive of interest) arose from two sources of loss : shrinkage in the weight of cattle from the protracted voyage, and fall in the market value of the cattle during the delay in arrival ; and that these two causes together made the loss seven thousand eight hundred and fifty dollars;

and that one half thereof, to wit, three thousand nine hundred and twenty-five dollars, was and is to be attributed to each cause.'

"*Conclusions of Law.*

"There was a warranty that the vessel was seaworthy at the time of sailing from Boston. This warranty was not affected by the exceptions in the bill of lading. The breach of the warranty was the cause of all the damage claimed. The libellant is entitled to recover $7850 and interest."

The Circuit Court thereupon entered a final decree for the sum so found, together with interest and costs. The opinion is reported in 43 Fed. Rep. 681. Claimants appealed to this court.

Mr. *George Putnam* for appellants.

Mr. *Henry M. Rogers* for appellee.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

In *The Edwin I. Morrison*, 153 U. S. 199, 210, the language of Mr. Justice Gray, delivering the opinion of the Circuit Court in the present case, was quoted with approval, to this effect: "In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence."

After renewed consideration of the subject, in the light of the able arguments presented at the bar, we see no reason to doubt the correctness of the rule thus enunciated.

The proposition that the warranty of seaworthiness exists by implication in all contracts for sea carriage, we do not

understand to be denied; but it is insisted that the warranty is not absolute, and does not cover latent defects not ordinarily susceptible of detection. If this were so, the obligation resting on the shipowner would be, not that the ship should be fit, but, that he had honestly done his best to make her so. We cannot concur in this view.

In our opinion, the shipowner's undertaking is not merely that he will do and has done his best to make the ship fit, but that the ship is really fit to undergo the perils of the sea and other incidental risks to which she must be exposed in the course of the voyage; and, this being so, that undertaking is not discharged because the want of fitness is the result of latent defects.

The necessity of this conclusion is made obvious when we consider the settled rule in respect of insurance, for it is clear that the undertaking as to seaworthiness of the shipowner to the shipper is coextensive with that of the shipper to his insurer.

That rule is thus given by Parsons (1 Marine Insurance, 367): "Every person who proposes to any insurers to insure his ship against sea perils, during a certain voyage, impliedly warrants that his ship is, in every respect, in a suitable condition to proceed and continue on that voyage, and to encounter all common perils and dangers with safety. . . . This warranty is strictly a condition precedent to the obligation of insurance; if it be not performed, the policy does not attach; and, if this condition be broken, at the inception of the risk in any way whatever and from any cause whatever, there is no contract of insurance, the policy being wholly void."

In *Kopitoff* v. *Wilson*, 1 Q. B. D. 377, 379, 381, although, as there was no necessity to consider the law as to latent defects, whether such defects would constitute an exception cannot be said to have been passed on, the general rule was laid down as we have stated it, and the existence of the warranty in question on the part of a shipowner was asserted with reference to his character as such, and not as existing only in those cases in which he is also acting as a carrier. That was an action in which the plaintiff sought to recover damages for the loss of a

large number of weighty iron armor plates and bolts, one of the plates having broken loose and gone through the side of the ship, which, in consequence, went down in deep water and was totally lost with all her cargo. The case was tried before Blackburn, J., who told the jury as matter of law that the shipowner warranted the fitness of his ship when she sailed, and not merely that he had honestly and in good faith endeavored to make her fit, and left the following questions to the jury : " Was the vessel at the time of her sailing in a state, as regards the stowing and receiving of these plates, reasonably fit to encounter the ordinary perils that might be expected on a voyage at that season from Hull to Cronstadt ? Second. If she was not in a fit state, was the loss that happened caused by that unfitness ? " The rule for new trial was discharged in view of the warranty by implication that the ship was in a condition to perform the voyage then about to be undertaken, and Field, J., among other things, said : " It appears to us, also, that there are good grounds in reason and common sense for holding such to be the law. It is well and firmly established that in every marine policy the assured comes under an implied warranty of seaworthiness to his assurer, and if we were to hold that he has not the benefit of a similar implication in a contract which he makes with a shipowner for the carriage of his goods, the consequence would be that he would lose that complete indemnity against risk and loss, which it is the object and purpose to give him by the two contracts taken together. Holding as we now do, the result is, that the merchant, by his contract with the shipowner, having become entitled to have a ship to carry his goods warranted fit for that purpose, and to meet and struggle against the perils of the sea, is, by his contract of assurance, protected against the damage arising from such perils acting upon a seaworthy ship."

This was the view expressed by Mr. Justice Brown, then District Judge, in *The Eugene Vesta*, 28 Fed. Rep. 762, 763, in which he said : " There can be no doubt that there is an implied warranty on the part of the carrier that his vessel shall be seaworthy, not only when she begins to take cargo

on board, but when she breaks ground for the voyage. The theory of the law is that the implied warranty of seaworthiness shall protect the owner of the cargo until his policy of insurance commences to run ; and, as it is well settled that the risk under the policy attaches only from the time the vessel breaks ground, this is fixed as the point up to which the warranty of seaworthiness extends." And the case of *Cohn* v. *Davidson*, 2 Q. B. D. 455, 461, was cited, where it appeared that the ship was not in fact seaworthy at the time she set sail, but that as she was found to be seaworthy at the time she commenced to take cargo, she must have received the damage in the course of loading; and Field, J., observed that "no degree of seaworthiness for the voyage at any time anterior to the commencement of the risk will be of any avail to the assured, unless that seaworthiness existed at the time of sailing from the port of loading. As, therefore, the merchant in a case like the present would not be entitled to recover against his underwriter by reason of the breach of warranty in sailing in an unseaworthy ship, it would follow that, if the warranty to be implied on the part of the ship-owner is to be exhausted by his having the ship seaworthy at an anterior period, the merchant would lose that complete indemnity, by means of the two contracts taken together, which it is the universal habit and practice of mercantile men to endeavor to secure."

The reasons for the strict enforcement of the warranty, in insurance, have frequently been commented on.

In *Douglass* v. *Scougall*, 4 Dow, 269, 276, Lord Eldon said: "I have often had occasion to observe here, that there is nothing in matters of insurance of more importance than the implied warranty that a ship is seaworthy when she sails on the voyage insured; and I have endeavored, both with a view to the benefit of commerce and the preservation of human life, to enforce that doctrine as far as, in the exercise of sound discretion, I have been enabled to do so. It is not necessary to inquire, whether the owners acted honestly and fairly in the transaction; for it is clear law that, however just and honest the intentions and conduct of the owner may be, if he is mis-

taken in the fact, and the vessel is in fact not seaworthy, the underwriter is not liable."

Similarly, Mr. Justice Curtis, in *Bullard* v. *Roger Williams Insurance Company*, 1 Curtis, 148, 155, stated in his charge to the jury : "There is an implied warranty connected with marine policies that the vessel, at the outset of her voyage, is seaworthy for the voyage in which she is insured. This obligation is imposed, by law, on the insured for sound reasons. It takes away all temptation to expose life and property to the dangers of the seas in vessels not fitted to encounter or avoid them. It is not a contract that the owner will use diligence to make his vessel seaworthy, but an absolute warranty that she is seaworthy, and if broken the policy is made void." And Mr. Justice Story, in *The Schooner Reeside*, 2 Sumner, 567, 575, declared " every relaxation of the common law in relation to the duties and responsibilities of the owners of carrier ships to be founded in bad policy and detrimental to the general interests of commerce."

As the same warranty implied in respect of policies of insurance exists in respect of contracts of affreightment, that warranty is necessarily as absolute in the one instance as in the other.

In *Putnam* v. *Wood*, 3 Mass. 481, 485, the Supreme Judicial Court of Massachusetts, speaking through Parker, J., said : " It is the duty of the owner of a ship, when he charters her or puts her up for freight, to see that she is in a suitable condition to transport her cargo in safety; and he is to keep her in that condition, unless prevented by perils of the sea or unavoidable accident. If the goods are lost by reason of any defect in the vessel, whether latent or visible, known or unknown, the owner is answerable to the freighter, upon the principle that he tacitly contracts that his vessel shall be fit for the use for which he thus employs her. This principle governs, not only in charter parties and in policies of insurance; but it is equally applicable in contracts of affreightment."

This early case is cited by Chancellor Kent, who affirms the doctrine in these words : " The ship must be fit and competent for the sort of cargo and the particular service in which she is engaged. If there should be a latent defect in the vessel, un-

known to the owner and not discoverable upon examination, yet, the better opinion is that the owner must answer for the damage caused by the defect. It is an implied warranty in the contract, that the ship be sound for the voyage, and the owner, like a common carrier, is an insurer against everything but the excepted perils." 3 Kent, *205.

The high authority of Lord Tenderden, (Abbott on Shipping, 1st ed. 146,) Lord Ellenborough, (*Lyon* v. *Mells*, 5 East, 428,) Mr. Baron Parke, (*Gibson* v. *Small*, 4 H. L. C. 353, 404,) and Lord Blackburn (*Steel* v. *State Line Steamship Co.*, 3 App. Cas. 72, 86) may be invoked in support of this view, and it is sustained by decisions of this court; *The Northern Belle*, 9 Wall. 526; *Work* v. *Leathers*, 97 U. S. 579; preceding that of *The Edwin I. Morrison, supra*, which in terms adopts it. The point was distinctly ruled in *The Glenfruin*, 10 P. D. 103. There a steamship laden with cargo became disabled at sea in consequence of the breaking of her crank shaft. Such breakage was caused by a latent defect in the shaft, arising from a flaw in the welding, which it was impossible to discover. It was held that under his implied warranty of seaworthiness a shipowner contracts, not merely that he will do his best to make the ship reasonably fit, but that she shall really be reasonably fit for the voyage, and that as, when the Glenfruin started, the shaft was not reasonably fit for the voyage, she was unseaworthy and the owner was liable; and *Lyon* v. *Mells*, 5 East, 428; *Kopitoff* v. *Wilson*, 1 Q. B. D. 177; *Steel* v. *State Line Steamship Co.*, 3 App. Cas. 72, were referred to.

Again, in *The cargo ex Laertes*, 12 P. D. 187, a steamship became disabled at sea owing to the breaking of her flywheel shaft through a flaw in the welding existing at the commencement of the voyage, but not discoverable by the exercise of any reasonable care, and it was held that she was not seaworthy for the voyage, and that but for a limitation, on the implied warranty, in the bills of lading, there would have been a breach.

The point is thus put by Judge Brown, of the Southern District of New York, in *The Rover*, 33 Fed. Rep. 515, 516: "This warranty extends to latent defects not discoverable by

prior examination. Either the ship or the freighter must bear such risks; under the warranty of seaworthiness the law places this risk upon the ship and her owner." And see *The Lizzie W. Virden*, 19 Blatchford, 340, Blatchford, J.; *The Carib Prince*, 63 Fed. Rep. 266, Benedict, J.; *Whitall* v. *Brig William Henry*, 4 Louisiana, 223; *Talcot* v. *Commercial Ins. Co.*, 2 Johns. 124, 128.

It is urged that doubt is thrown upon the doctrine by the reasoning in *Readhead* v. *Midland Railway Co.*, L. R. 4 Q. B. 39; L. R. 2 Q. B. 412. There a passenger sought to charge a common carrier for an injury occasioned by the breaking of an axle by reason of a hidden flaw ; and the Court of Exchequer Chamber held that a contract made by a general carrier of passengers for hire with a passenger is to take due care (including in that term the use of skill and foresight) to carry the passenger safely, and is not a warranty that the carriage in which he travels shall be free from all defects likely to cause peril, although those defects were such that no skill, care, or foresight could have detected their existence. But the court was careful to point out the broad distinction between the liabilities of common carriers of goods and of passengers, and in the case at bar the shipowner was not only liable as such, but as a common carrier, and subject to the responsibilities of that relation.

The case was decided in 1869, and those of *The Glenfruin* and *The Laertes* in 1885 and 1887, yet the latter rulings seem to have been accepted without question, and were certainly unaffected by any attempt to apply a rule in respect of roadworthiness in the carriage of passengers by a railroad to the warranty of seaworthiness in the carriage of goods by a ship.

In our judgment the Circuit Court rightly held that the warranty was absolute; that the Caledonia was unseaworthy when she left port ; and that that was the cause of the damage to libellant's cattle.

This brings us to the inquiry whether the claimants can escape from the liability which the law imposed upon them by reason of the exceptions in the bill of lading.

These exceptions were: " The act of God, the Queen's

enemies, pirates, restraint of princes and rulers, perils of the sea, rivers, navigation and land transit, of whatever nature or kind, restrictions at port of discharge, loss or damage from delays, collisions, straining, explosion, heat, fire, steam boilers and machinery or defects therein, transshipment, escape, accidents, suffocation, mortality, disease or deterioration in value, negligence, default or error in judgment of pilots, master, mariners, engineers, stevedores, or any other person in the employ of the steamship or of the owners or their agents."

It is claimed that the Caledonia was exempted from the losses caused by her unseaworthiness from the defective shaft at the commencement of the voyage by the exception of "loss or damage from delays, . . . steam boilers and machinery or defects therein."

As is well said by counsel for appellee, the exceptions in a contract of carriage limit the liability but not the duty of the owner, and do not, in the absence of an express provision, protect the shipowner against the consequences of furnishing an unseaworthy vessel. *Steel* v. *State Line Steamship Company*, 3 App. Cas. 72; *Gilroy* v. *Price*, App. Cas. (1893) 56; *The Glenfruin*, 10 P. D. 103; *Kopitoff* v. *Wilson*, 1 Q. B. D. 377; *Tattersall* v. *National Steamship Company*, 12 Q. B. D. 297; *Thames & Mersey Ins. Company* v. *Hamilton*, 12 App. Cas. 484, 490. If the exceptions are capable of, they ought to receive, to use the language of Lord Selborne in *Steel* v. *Steamship Company*, " a construction not nullifying and destroying the implied obligation of the shipowner to provide a ship proper for the performance of the duty which he has undertaken."

There was no exception in this bill of lading which in express words exempted the shipowner from furnishing a seaworthy vessel at the commencement of the voyage. As the exceptions were introduced by the shipowners themselves in their own favor, they are to be construed most strongly against them, and we perceive no reason why the obligation to furnish a seaworthy vessel should be held to have been contracted away by implication. Their meaning ought not to be extended to give the shipowner a protection, which, if intended, should have been expressed in clear terms.

Moreover, the words "delays," "steam boilers and machinery or defects therein," formed part of a long enumeration of the causes of damage, all the rest of which related to matters subsequent to the beginning of the voyage, and, by another familiar rule of construction, they should be treated as equally limited in their scope.

In *Tattersall* v. *Steamship Company*, cattle had been shipped under a bill of lading, by which it was provided that the defendants were to be "in no way responsible either for their escape from the steamer or for accidents, disease, or mortality, and that under no circumstances shall they be held liable for more than £5 for each of the animals." The ship, after carrying a cargo of cattle on a previous voyage, was improperly cleaned, and those on this voyage took the foot and mouth disease. It was held that the liability of the defendants was not limited to £5 for each of the cattle, for the stipulations of the bill of lading related to the carriage of the goods on the voyage, and did not affect the obligation to have the ship fit for the reception of the cattle.

In *The cargo ex Laertes*, 12 P. D. 187, cargo was shipped under three different forms of bills of lading, the exceptions in which, so far as material, were respectively as follows: "Warranted seaworthy only so far as ordinary care can provide;" "warranted seaworthy only so far as due care in the appointment or selection of agents, superintendents, pilots, masters, officers, engineers, and crew can insure it;" "owners not to be liable for loss, detention, or damage . . . if arising directly or indirectly . . . from latent defects in boilers, machinery, or any part of the vessel in which steam is used, even existing at time of shipment, provided all reasonable means have been taken to secure efficiency." These exceptions were held to limit the implied warranty of seaworthiness in accordance with the expressed intention of the parties to that precise effect, and for that reason only to take the case out of the general rule.

We are not dealing with the question of how far exceptions may be given effect in particular cases, but whether by those under consideration claimants were exempted from liability

for unseaworthiness, and we are clearly of opinion that they were not.

Something was said as to protection from liability by reason of the words in the original memorandum of agreement that "the shipper assumes all risk of mortality or accident, however caused, throughout the voyage." We agree with the Circuit Court that the bill of lading can alone be considered as the contract between the parties, the memorandum being preliminary merely; but we are also of opinion that the same rule of construction would apply to the memorandum as to the bill of lading, and that the assumption of the risk of mortality or accident throughout the voyage did not constitute an exemption of the shipowner from his obligation to furnish a seaworthy vessel at its commencement.

By reason of the unseaworthiness of the Caledonia the cattle were not delivered at the time and place, when and where they should have been, and loss was incurred through shrinkage in weight from the protracted voyage and through fall in market value during the delay in arrival.

It is argued that a common carrier is not liable for mere delay and its consequences unless he has been at fault, and that claimants were in this case free from blame because the defect was a secret one. This contention, however, begs the question, for the conclusion upon this record is that claimants are responsible for breach of warranty notwithstanding the shaft was defective through hidden weakness. No question can be made that the shrinkage was a direct result of that breach, but it is further insisted that changes in market value were too speculative to furnish just basis for recovery. But as it is found as a fact that these parties, at the time of contracting together, knew and contemplated that the cattle were not to be sold before arrival, but were to be sold at the first possible market day after arrival, it follows that the damages by reason of the fall in price were not remote, but flowed naturally from the breach of warranty. *Howard* v. *Stillwell Mfg. Co.*, 139 U. S. 199; *Cincinnati Gas Co.* v. *Western Siemens Co.*, 152 U. S. 200; *King* v. *Woodbridge*, 34 Vermont, 565; *Laurent* v. *Vaughn*, 30 Vermont, 90; *Ayres* v. *Chicago & Northwestern*

*Railway,* 75 Wisconsin, 215; *Deming* v. *Grand Trunk Railroad Co.,* 48 N. H. 455; *Wilson* v. *Lancashire and Yorkshire Railway,* 9 C. B. (N. S.) 632; *Collard* v. *Southeastern Railway,* 7 H. & N. 79; *The City of Para,* 44 Fed. Rep. 689; and cases cited by the Circuit Court

*Decree affirmed.*

MR. JUSTICE BROWN, with whom concurred MR. JUSTICE HARLAN and MR. JUSTICE BREWER, dissenting.

1. Conceding, for the purposes of this case, that under the stringent rule laid down by this court in *Richelieu Navigation Co.* v. *Boston Insurance Co.,* 136 U. S. 408, 428, and *The E. I. Morrison,* 153 U. S. 199, the carrier is bound to respond for any loss of, or direct damage to, goods in consequence of a breach of his implied warranty of seaworthiness, whether such unseaworthiness were known or unknown, discoverable or undiscoverable, it does not necessarily follow that he is subject to the same measure of liability for damages occasioned by mere delay in making the voyage within the usual time.

All the cases cited in the opinion of the court are those wherein either the ship or the cargo has suffered loss or direct damage, by reason of her unseaworthiness at the commencement of the voyage.   Both in this court and in the court below the case is treated as one involving the liability of the carrier as an insurer of the goods in question.   The authorities, however, make a clear distinction between the loss of or direct damage to goods on account of unseaworthiness, and the consequences of mere delay.   In the one case the contract is to deliver the goods at all events, the acts of God and the perils of the sea alone excepted.   In the other, it is to use all reasonable exertions to carry the goods to the port of destination within the usual time.

The distinction is nowhere better or more concisely stated than in *Parsons* v. *Hardy,* 14 Wend. 215, 217, which was an action to recover the price for the transportation of a quantity of merchandise from Albany to Ithaca.   Plaintiff received the goods at Albany on board a canal boat, consigned to Ithaca.

He was forced to stop at an intermediate point in consequence of ice in the canal, the defendant receiving the goods and transporting them to Ithaca. Defendant said that plaintiff was not entitled to recover because he had failed to deliver the goods as agreed. Plaintiff offered to prove that he was delayed in the canal in consequence of a collision with a scow, by which his boat was injured; and that he was obliged to stop and repair it. The court charged the jury that the accident to the boat, though caused by misfortune and without fault of the plaintiff was no cause for his delay, which nothing could excuse but the act of God or the enemies of the country. This instruction was held to be erroneous, Mr. Justice Sutherland observing: "Plaintiff, as a common carrier, was responsible at all events for the final safety and delivery of the defendants' goods to them at Ithaca. Nothing could exonerate him from that responsibility but the act of God, or a public enemy. But in respect to the *time of delivery*, he was responsible only for the exertion of due diligence. In this respect, common carriers stand upon the same ground with other bailees. They may excuse delay in the delivery of goods by accident or misfortune, although not inevitable, or produced by the act of God. It is sufficient, if they exert due care and diligence to guard against delay, if the goods are finally delivered in safety. The principle upon which the extraordinary responsibility of common carriers is founded does not require that that responsibility should be extended to the time occupied in the transportation."

The principle of this case was affirmed in *Wibert* v. *New York & Erie Railroad*, 12 N. Y. 245, 251, which was an action to recover damages for the negligence of the defendant in not transporting to and delivering at New York a quantity of butter within a reasonable time. The defence was that there was an unusual quantity of merchandise delivered to defendant to be transported to New York; that its road was in good order, properly equipped, and that as many trains were run as could be with safety; but that the quantity of merchandise exceeded the capacity of the road to transport the same immediately, and that it accumulated in the depots.

The delay was held to be excused. Said the court: "The law, upon well-known motives of policy, has determined that a carrier shall be responsible for the loss of property entrusted to him for transportation, though no actual negligence exist, unless it happen in consequence of the act of God, or the public enemy; but when the goods are actually delivered at the place of destination, and the complaint is only of a late delivery, the question is simply one of reasonable diligence, and accident or misfortune will excuse him, unless he have expressly contracted to deliver the goods within a limited time."

In *Thayer* v. *Burchard*, 99 Mass. 508, it was also held that the fact that there was a great accumulation of freight for transportation over a railroad was sufficient to relieve the corporation from liability for the consequences of delay in transportation. "For losses, expenses, or other damage arising from mere delay, occasioned by a temporary excess of business, and without fault, the carrier is not responsible." To the same effect are *Galena & Chicago Railroad* v. *Rae*, 18 Illinois, 488 ; *Helliwell* v. *Grand Trunk Railway*, 10 Bissell, 170. In *Geismer* v. *Lake Shore Railway*, 102 N. Y. 563, and *Lake Shore Railway* v. *Bennett*, 89 Indiana, 457, it was held that a railroad was not liable where a mob of strikers impeded or interrupted the carriage of the goods in question. In the following cases it was also held that the carrier was responsible only for the consequences of unreasonable delay : *The Success*, 7 Blatchford, 551 ; *Page* v. *Munro*, 1 Holmes, 232 ; *Ward* v. *N. Y. Central Railroad*, 47 N. Y. 29 ; *Hand* v. *Baynes*, 4 Wharton, 204 ; *Kinnick* v. *Chicago, Rock Island &c. Railway*, 69 Iowa, 665 ; *Boner* v. *Merchants' Steamboat Co.*, 1 Jones Law, (N. C.) 211 ; *Conger* v. *Hudson River Railroad*, 6 Duer, 375 ; *Pittsburg, Fort Wayne &c. Railroad* v. *Hazen*, 84 Illinois, 36.

The English cases are even more explicit than our own, in treating the contract of the carrier as demanding only the exercise of due diligence with respect to the time of delivery. A leading case is that of *Briddon* v. *Great Northern Railway*, 28 L. J. Exch. 51 ; *S. C.* 4 H. & N. 847 (Am. ed.), which was an action against a railway company for a failure to deliver

certain beasts within a reasonable time, whereby the beasts were deteriorated in condition, and a market lost (precisely the damages which are claimed in this case). Transportation was delayed by a heavy snow storm, by which the market day at Nottingham was lost. It was claimed that, under the circumstances, the road was bound to obtain additional engines, and use extraordinary efforts to send on the cattle-trucks. But the court held that the contract entered into was to carry the cattle without delay, and in a reasonable time under *ordinary circumstances*. That, if a snow storm occurred which made it impossible to carry the cattle, except by extraordinary effort, involving additional expense, the company was not bound to use such means and to incur such expense. In *Hales* v. *London & Northwestern Railway*, 4 B. & S. 66, 71, a jury found that the goods were not delivered within a reasonable time. Lord Chief Justice Cockburn said: "Where no time is mentioned for delivering goods carried, the obligation of the carrier is to deliver them within a reasonable time; and that is a question of fact. The person who sends goods is not entitled to call upon the carrier to go out of his accustomed course, or to use extraordinary means of conveyance; but the carrier must do that which is within his power, and which it is reasonable to expect that he should do for delivering the goods."

The case of *Taylor* v. *Great Northern Railway*, L. R. 1 C. P. 385, 387, 388, was an action for damages sustained in consequence of a delay in the delivery of three hampers of poultry, sent by the railway for the early London market. The delay was occasioned by an accident which occurred on defendant's line to a train of another railway company, which had running powers over that portion of the line. The accident resulted solely from the negligence of the servants of the other corporation. It was held that the railway was not responsible, Erle, C. J., observing: "I think a common carrier's duty to deliver safely has nothing to do with the time of delivery; that is a matter of contract, and when, as in the present case, there is no express contract, there is an implied contract to deliver within a reasonable time, and that I take to mean a

time within which the carrier can deliver, using all reasonable exertions." Said Montague Smith, J.: " Common carriers do indeed insure to this extent, that they will safely and securely carry the goods, but not to the extent of guaranteeing their arrival at any particular time." The maritime cases in England nearly all turn upon the question of reasonable time for the delivery of the goods after the ship arrives at her port of destination.

Counsel for the appellee has failed to cite an authority which lends countenance to the theory of the opinion in this case, that the liability of the carrier for the consequences of delay is coextensive with his liability for the loss of the goods carried. Not only do the general principles of law hold him liable simply for the exercise of diligence, but the bill of lading in this case expressly exonerates him for "loss or damage from delays." From reasons of public policy, and from the fact that the carrier and his servants are solely entrusted with the custody of goods carried, and the owner has no means of protecting himself against their embezzlement or negligence, the law has imposed upon the carrier the stringent liability of an insurer. As was said by Lord Holt in *Coggs* v. *Bernard*, 2 Ld. Raym. 909, 918 : " This is a politic establishment contrived by the policy of the law, for the safety of all persons, the necessity of whose affairs obliges them to trust these sorts of persons, that they may be safe in their ways of dealing ; for else these carriers might have an opportunity for undoing all persons that had any dealings with them, by combining with thieves, etc., and yet doing it in such a clandestine manner as would not be possible to be discovered. And this is the reason the law is founded upon in that point."

These reasons, however, have no application to his carrying within a reasonable time. As to such contract, the law imposes upon him no extraordinary liability.

As it is admitted in this case that the delay was occasioned by a defect in the ship, which could not have been discovered by the ordinary methods of inspection, it seems to me clear that the carrier should not be held responsible. If it be said

that the damages in this case were the direct consequences of the breach of warranty of seaworthiness, the reply is that for *such damages* the ship is not responsible, provided her owner has used due diligence to make her seaworthy, although if the goods had been lost or destroyed, he would have been liable as insurer. In the cases above cited, if the merchandise had been *lost* in consequence of the collision in the canal, the extraordinary accumulation of freight, the violence of the mob, or the accident upon the railway, there could have been no doubt whatever that the carrier would have been liable; but as the consequence of the accidents in each case was a mere delay in the delivery of the goods, the carrier was exonerated. I find it impossible to distinguish these cases in principle from the one under consideration.

2. There is also a further exception in the bill of lading in this case of "loss or damage from . . . machinery, or defects therein." This exception was obviously inserted for the purpose of exempting the ship from some liability to which, without such exception, she would be subject. It evidently was not intended to apply to mere breakages of machinery, which should occur after the voyage began, since the breaking of sound machinery through stress of weather is treated as an inevitable accident or peril of the sea, for which the ship would not be liable, whether there were an exception or not. *The Virgo*, 3 Asp. Mar. Law Cas. 285; *The William Lindsay*, L. R. 5 P. C. 338.

The exception, then, must be referable to latent defects in the machinery, existing at the time the voyage began. Of course, it does not apply to negligent defects or to those which might have been discovered by the exercise of ordinary care, but as to any latent defects I regard this exception as exonerating the carrier. There are but few cases, either in this country or in England, where the direct question has been presented, but in all those to which our attention has been called similar exceptions are treated as valid and binding. Thus in *The Miranda*, L. R. 3 Ad. & Ec. 561, a steam vessel became disabled at sea, in consequence of her machinery breaking down. Her cargo had been shipped under bills of

lading, which contained "accidents from machinery" among the excepted perils. Another steamship, belonging to the same owners, fell in with the disabled vessel, towed her into port, and took proceedings against the cargo to recover salvage. The defence was that the Miranda was unseaworthy. The court held, first, that there was no sufficient evidence to find that she was unseaworthy at the time the cargo was shipped, and even if there were, that the exception of "accidents from machinery" exonerated the vessel from the consequence of such breakage, and rendered the cargo liable for its proportion of salvage. The *Cargo ex Laertes*, 12 P. D. 187, was a similar case, wherein the cargo was proceeded against for salvage. The bills of lading under which the cargo was shipped contained, among other excepted perils, the clauses: "Warranted seaworthy only so far as ordinary care can provide," and "owners not to be liable for loss, detention, or damage . . . if arising directly or indirectly . . . from latent defects in boilers, machinery," etc. The Laertes broke down from a latent defect, which could not have been discovered by the exercise of reasonable care, and it was held that the exception of latent defects, if it did not abrogate, at all events limited, the warranty which the law would otherwise imply that the ship was seaworthy at the beginning of the voyage. This case is directly in point. In *The Curlew*, 51 Fed. Rep. 246, affirmed by the Court of Appeals, 8 U. S. App. 405, the breaking of a junk ring on the engine cylinder was held to be an accident of the sea and of the machinery, within the meaning of a charter party exempting the party from liability for loss of cargo caused by such accident. And in *The Carib Prince*, 63 Fed. Rep. 266, a similar exemption of latent defects was held to cover damages from a defective rivet in the bulkhead side of a water tank where, the ship being a new one, the tank had been tested by hammer and water pressure and no defect had been disclosed.

The cases cited in the opinion of the court do not seem to me to support its conclusion. In *Steel* v. *State Line Steamship Co.*, 3 App. Cas. 72, the cargo was damaged by sea water getting into a port hole which had been negligently fastened.

There was no doubt that the loss was due to the negligence of the ship. In *Gilroy* v. *Price*, App. Cas. (1893), 56, there was an exception of liability for neglect in the navigation of the ship in the ordinary course of the voyage, and it was held, very properly, that this did not apply to the warranty of seaworthiness, that the loss occurred from unseaworthiness at the time the vessel started on her voyage, and that the owners of the ship were liable. In *The Glenfruin*, 10 P. D. 103, there was an exception of " all and every the dangers and accidents of the seas and of navigation of whatsoever nature or kind," and this was held not to exonerate the vessel from the consequence of the breaking of her crank shaft from a defect in the welding which made her unseaworthy. In *Tattersall* v. *National Steamship Co.*, 12 Q. B. D. 297, there was clear proof of negligence in not cleansing and disinfecting the ship, in consequence of which plaintiff's cattle contracted a disease, for which the ship was, of course, held liable. In *Kopitoff* v. *Wilson*, 1 Q. B. D. 377, there was a failure to stow certain iron plates in a proper manner, so that one of them broke loose and went through the side of the ship. But there was in that case no exception in the bill of lading. The case of the *Insurance Co.* v. *Hamilton*, 12 App. Cas. 484, is equally inapplicable.

If, under the circumstances of the present case, the vessel be not exonerated by the exception in the bill of lading of " loss or damage from machinery or defects therein," I am wholly unable to conceive what defects the exception was intended to cover. I am not aware that there is any magic in the words " implied warranty of seaworthiness," which enables them to override all the other general principles of law applicable to the responsibility of the carrier, as well as the express terms of his contract with the shipper.

I am, therefore, constrained to dissent from the opinion of the court, and am authorized to state that MR. JUSTICE HARLAN and MR. JUSTICE BREWER concur in this opinion.