CONNELL BROS. CO. (CANADA), Limited v. SEVENSEAS TRADING & STEAMSHIP CO., S. A., et al.

AMERICAN FACTORS, Limited, v. SEVENSEAS TRADING & STEAMSHIP CO., S. A., et al.

Nos. 25530–R, 25531–G.

United States District Court N. D. California, S. D.

April 1, 1953.

Lloyd M. Tweedt, Derby, Sharp, Quinby & Tweedt, San Francisco, Cal., for libelant Connell Bros. Co. (Canada) Limited.

Lyman Henry, Hall, Henry & Oliver, San Francisco, Cal., for libelant American Factors, Limited.

Lillick, Geary, Olson, Adams & Charles, by William M. Brinton, San Francisco, Cal., for respondents Sevenseas Trading & Steamship Co., S. A., and another.

ROCHE, Chief Judge.

Libelants in these two cases, which were consolidated for trial, seek to recover prepaid freight and damages for cargo lost when The Salina Cruz burned and sank while en route from Vancouver, B. C. to Honolulu. In each case the respondents have set up as affirmative defenses the inclusion in the bills of lading of the "freight earned, ship and/or cargo lost or not lost" clause and the provisions of the so-called Fire Statute, 46 U.S.C.A. § 182. The Court will dispose of the prepaid freight question first.

The evidence shows that respondent Sevenseas is a family owned Panamanian corporation of which respondent Stralla is president and general manager. The Salina Cruz, a vessel of Panamanian registry, was acquired from the West Coast Line in April of 1949 and had made only one voyage under Sevenseas ownership prior to the fatal voyage in October, 1949. Cargo shipments for the October voyage were secured by Sevenseas' San Francisco agent through respondent Anglo Canadian Shipping Co., Ltd. The bills of lading that issued for these shipments were the so-called "Baltimore Form C" which did not contain the freight earned clause. Respondents contend, however, that Sevenseas had adopted the West Coast Line form of bill of lading which did contain the freight earned clause, and that this form was incorporated in the contract of affreightment because the booking agreement provided that "At all times while the cargo

is in carrier's custody, it shall be subject to the terms, exceptions and conditions of the carrier's regular bill of lading, which shipper hereby agrees to accept and be bound by."

· This contention presents several· difficulties. First, there is no evidence that Sevenseas had heretofore used the West Coast Line form as a contract of carriage, the only prior cargo shipment having moved under a special contract of affreightment which provided that any bill of lading issued would be a mere receipt. Second, respondents' San Francisco agent testified that Sevenseas had no regular bill of lading in the usual sense and that in making up the booking agreement he had merely used stock provisions without having any specific Sevenseas bill of lading in mind. Third, there is no evidence that there was any form of bill of lading attached to the booking agreement at the time it was signed by libelants. Fourth, it is uncontroverted that the only bill of lading received by libelants were the "Baltimore Form C".

■ The general rule is that the bills of lading which are issued constitute the contract of affreightment and the carrier will not be permitted to go behind them and refer to some other document for all or parts of the contract terms. The ·Caledonia, 157 U.S. 124, 139, 15 S.Ct. 537, 39 L.Ed. 644. It is true that the shipper and carrier may agree that the booking agreement, rather than the bill of lading, shall govern the transportation but there is no evidence of such an agreement in this case. Even had there been, there is no conflict between the express terms of the booking agreement and the bills of lading that issued. In the light of the evidence presented the Court concludes that the shipments were made under the "Baltimore Form C" bill of lading and since this did not contain the freight earned clause, libelants are entitled to recover the moneys paid as prepaid freight.

■ Section 4282 of the Revised Statutes, 46 U.S.C.A. § 182, commonly known as the Fire Statute, reads as follows:

"No owner of any vessel shall be . liable to answer for or make good to any person any loss or damage, which . may happen to any merchandise·whatsoever, which shall· be shipped,·taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

To deprive the owner of the benefit of this statute, the claimant must prove (1) the cause of the fire, (2) the existence of· design or negligence, and (3) that such design or negligence was that of the owner himself or his managing agent. It is not sufficient to advance a plausible theory unsupported by concrete proof. There must be positive testimony from which the cause of the fire can be inferred, and no other reasonable cause assigned for the fire. If the proof leaves the origin of the fire purely a matter of speculation, the Fire Statute prevents a recovery by the cargo owners. Charbonnier v. United States, D. C., 45 F. 2d 166, 170; Hoskyn & Co. v. Silver Line (The Silvercypress), 2 Cir., 143 F.2d 462.

■ The evidence in this case shows that The Salina Cruz was a steam schooner with two water tube boilers. She encountered rough weather from Long Beach, California, to Vancouver and James C. Peckham, her chief engineer, decided that it was necessary to rebrick a portion of the after, or target, wall of the starboard boiler. Accordingly, when the vessel reached Vancouver the starboard boiler was shut down and approximately 80 per cent of the target wall and two rows on the portside wall were rebricked. The following day the starboard boiler was placed in operation and the port boiler shut down for replacement of 15 or 20 bricks. In each instance the bricks were bonded with clay and cement, no anchor bolts being used. Indeed it appears that the boiler blueprints made no provisions for anchor bolts. The work was done by the second engineer and fireman under the supervision of the chief and first engineer.

The Salina Cruz sailed approximately 24 hours after the brick work in the port boiler had been completed. The fire was discovered by the chief engineer between 6:30 and 7:00 o'clock on the morning of

the second day after sailing. He testified that he saw smoke coming up from between the two boilers, which were about 18 inches apart. He saw no fire at that time. He was unable to get through this passageway to the bulkhead because of the dense smoke but advanced far enough to see the light of flames behind the port boiler before he was forced to abandon the engine room. Benjamin Ivey, the master, likewise testified to dense smoke with intermittent flames on the port side between the boiler and bulkhead. The second officer and the first assistant engineer both testified to the quantity of heavy black smoke that made entrance into the engine room impossible and soon permeated the entire ship. The ship was abandoned about 7:30 a. m. and subsequently sank.

It thus appears that the fire was a sudden and rapidly developing one characterized by heavy black smoke and steam that frustrated the crew's efforts to control it, and that it apparently started behind the port boiler in which only minor brick repairs had been made.

Libelants contend that the brick repair work was improperly done; that, as a consequence, the target wall fell in, permitting the flame of the firing unit to strike the metal casing of the boiler, with the result that the boiler casing overheated and ignited the wooden bulkhead which was only eight inches distant at its closest point. To support this theory they introduced expert testimony to the effect that cement and mortar are not sufficient to hold bricks in place in a "nearly vertical" target wall; that boiler bricking in American ships is customarily done by shoreside specialists rather than by members of the crew because it calls for special know-how and skill; that if the brick target wall fell down, the casing would overheat and might ignite any inflammable material close to it. On cross-examination libelants' expert witness testified that if the bricks fell down and the wooden bulkhead ignited, the resulting smoke would be gray; that only an oil fire with an insufficiency of air would produce a heavy black smoke.

On behalf of respondents there was testimony that the target wall angle was between 20 and 30 degrees; that it was usual on foreign ships for crew members to do boiler brick work; that both the chief and first assistant engineer had done such work; that the top of the boilers was crossed by an oil line running from a tank to the galley stove and a break in this line would allow the oil to run down alongside the stack inside the fidley and to the back of the boiler; that the fire might have been caused by this fuel line rupturing or by the back end of the boiler rupturing because the brick had fallen in; that the bilges and bulkhead were clean and free from oil.

The presence of heavy black smoke with only intermittent flames would incline the Court to the ruptured fuel line theory. Neither theory, however, is supported by sufficient proof to enable the Court to assign the cause of the fire. It is thus left in the realm of speculation and libelants have failed to carry the burden resting upon them. In accordance with the foregoing it is, therefore, by the Court.

Ordered that there be entered herein, upon findings of fact and conclusions of law, judgment as follows:

1. That libelant Connell Bros. Co. (Canada), Limited, a corporation, recover from respondents Sevenseas Trading & Steamship Co., S. A., a corporation, and Anthony C. Stralla the sum of $11,385.53, together with interest thereon at the rate provided by law.

2. That libelant American Factors, Limited, a corporation, recover from respondents Sevenseas Trading & Steamship Co., S. A., a corporation, and Anthony C. Stralla the sum of $13,569.06, together with interest thereon at the rate provided by law.

3. That libelants take nothing by their cause of action for damages for non-delivery of cargo.

4. That the respective parties pay their own costs.

### Motion to Strike

It is further ordered that libelants' motion to strike respondents' Exhibits "E", "F", and "G" be and the same hereby is granted and said exhibits are hereby stricken.