**MAYRONNE DRILLING MUD, CHEMICAL & ENGINEERING SERVICE**

v.

**THOMAS JORDAN, Inc. et al.**

**THE TJ–318.**

**No. 2194.**

United States District Court
E. D. Louisiana, New Orleans Division.

Dec. 22, 1953.

88 87

Terriberry, Young, Rault & Carroll,
Benjamin W. Yancey, New Orleans, La.,
proctors for libelant.

Lemle & Kelleher, Charles Kohlmeyer,
Jr., New Orleans, La., proctors for re-
spondent.

WRIGHT, District Judge.

Libelant here is suing for damage to
its cargo resulting when a barge char-
tered from respondent made water
through a hole in her after rake and was
beached to prevent total loss. The pri-
mary question concerns an alleged waiv-
er of the warranty of seaworthiness in
the charter party. The issues of fact
and law having come on to be heard on
the pleadings and proofs of the parties
and due deliberation having been had,
the court now makes the following find-
ings of fact and conclusions of law.

Findings of Fact

1. Libelant Mayronne Drilling Mud
& Engineering Service was at all times
hereinafter mentioned and now is a Lou-
isiana partnership consisting of Mrs. El-
la DeBlanc Mayronne and R. W. May-
ronne, Jr., both residents of the Parish
of Orleans, of full age of majority. Re-
spondent Thomas Jordan, Inc., was at
all times hereinafter mentioned and now
is a corporation organized and existing
under and by virtue of the laws of the
State of Delaware, with its principal of-
fice in New Orleans, Louisiana.

2. At all times hereinafter mentioned respondent was the owner of the steel deck barge known as The TJ–318, having dimensions of 122' x 31' x 7'. Barge TJ–318 was acquired by respondent from the United States Engineers on June 27, 1951. The barge had been constructed approximately forty years prior to that date for, and had been used by, the United States Engineers as a winch barge; that is, winches and pumps had been permanently installed on the deck of the barge. There had also been permanently installed therein a syphon system with overboard discharge pipes.

3. After acquiring the barge, respondent retained George W. Blair, a competent marine surveyor of New Orleans, Louisiana, to supervise the preparation of the barge for use as a deck barge. The barge was towed to Canulette Shipbuilding Company, Inc., a competent ship repair yard at Slidell, Louisiana. Instructions were given the Yard to remove all piping and to weld all openings in the deck, sides, rakes, headlogs and bulkheads in the way of the pipe removals, remove obstructions on deck, and in general to make the barge ready for use in the trade for which it was intended. Repairs were started on or about July 23, 1951 and were completed on or about August 6, 1951. During the period of repair, Mr. Blair, for account of respondent, made numerous trips to Slidell to check the progress and efficiency of the performance of the work.

4. On or about August 6, 1951 the barge was chartered by respondent to Southern Production Company of Baton Rouge. The barge remained under charter to that Company until October 10, 1951, when it was returned to respondent. During the period that Southern Production Company had the barge under charter it was used in and about Lake Pontchartrain and Lake Maurepas for the transportation of a large, heavy and costly drilling rig and other gear which, when aboard the barge, caused her to have a freeboard of approximately two feet.

5. On or about October 8, 1951 Mr. Thomas Meyers, General Manager of libelant's plant at Harvey, Louisiana, telephoned Mr. Robert Cox, Superintendent of respondent's marine equipment, and inquired as to the availability of a barge. He was advised that Barge TJ–318 would be available at the wharf of J. Ray McDermott Company in the Harvey Canal on or about October 10. Mr. Meyers stated that he would inspect the barge and see if it was suitable for the purposes for which he wanted it used.

6. On October 10th, Mr. Meyers and Mr. Cox went aboard the barge at McDermott wharf, Harvey Canal, and there, in Mr. Cox's presence, Mr. Meyers looked at her to see whether she was suitable for his purpose. He did not go into the tank spaces of the barge, did not inspect their interior and did not see any holes in the deck or the sides of the barge. Mr. Cox was present throughout the examination, saw the extent of the examination, and knew and understood that the only examination by libelant was directed solely to determine whether or not the barge suited libelant's purpose, and was not directed to any determination of the general seaworthiness of the barge.

7. On October 10, 1951, Mr. Meyers stated that the barge was suitable for his use if the deck were made level by the removal of certain protuberances thereon. The protuberances consisted of small pieces of steel which had been used in order to secure equipment on the deck of the barge. Mr. Cox gave an order to Ike Haggard Machine Works to remove the protuberances. This work was completed on October 10th and Mr. Meyers was so informed. Later that day, Mr. Meyers telephoned to Mr. Cox stating that he had looked at the barge again and that it was now acceptable. The charter party was then executed by both parties on a printed form furnished by respondent.

8. The barge was shifted from the wharf of J. Ray McDermott to libelant's.

wharf on the Harvey Canal at about 10 o'clock A. M. on October 11, 1951 by a tug owned by George Buras, an independent contractor. At the wharf of libelant the barge was moored port side to and was immediately loaded by the warehouse crew of libelant, consisting of three men under the supervision of libelant's superintendent, Harold Pellegrin. The loading was completed at about 3 o'clock P. M. on October 11, 1951. The cargo consisted of drilling mud, clay and chemicals, packaged in 25, 50 and 100 lb. bags and also in 100 lb. drums. The cargo was stacked on wooden pallets which were placed on the barge.

9. The stowage of the barge was handled by lift trucks which ran on the deck of the barge and lowered the pallets thereon. At the time that the loading was completed, the barge had a free board of approximately 2 feet forward and 1½ feet aft. This was ascertained by observation, but no exact measurement was made or was possible. The total gross weight of the cargo was 450 tons, more or less, which was within the barge's capacity. The method of loading and stowing the cargo aboard the barge was in every respect proper, and the barge was not overloaded.

10. After loading of the barge, it was taken into tow by the Tug Agnes B owned by George Buras and hired by libelant to tow the barge through the Harvey Canal and down the Mississippi River to Pointe-a-la-Hache. The tug left the dock at approximately 8:30 P.M. October 11, 1951 with the barge made up in front of the tug. The tow transited the Harvey Locks at about 1:15 A. M. on October 12 and proceeded down the Mississippi River at about six or seven miles per hour. The weather at that time was clear with little or no breeze. As they proceeded down the river fog began to set in, and at 3:30 A. M. visibility was reduced to about 150 feet. The tug rounded to and flanked the port bow of the barge against the west bank of the river in the vicinity of Cutoff Light, and held the barge against the bank by working its engines slow ahead.

11. At about 6 A. M. on October 12 the fog had lifted and the tow got under way again. It was then daylight. At about 8:10 A. M. the captain of the tug noticed that the cables leading from the capstan of the tug to the barge were taking a heavy strain. He directed that these cables be replaced with three-inch manila lines. As the lines were being changed the master noticed that The TJ–318 had settled on an even keel 4 or 5 inches by the stern and realized that she was making water. They were near Belair at that time. The master then radioed the Harvey office of the owner of his tug, advising that The TJ–318 was sinking and that he was going to attempt to beach her. He proceeded toward the west bank, in the vicinity of Belair, and ran the bow of The TJ–318 into the bank perpendicular to the shore line. This maneuver did not prove satisfactory and the master of the tug then decided to make a run for Poverty Point on the east bank of the river. The tow arrived at Poverty Point at approximately 9:30 A. M. and the bow of the barge was run hard aground. The Agnes B shifted to the starboard side of The TJ–318, ran out one headline and began to go full ahead to drive the barge up on the bank as far as possible. At the same time the deckhand was sent to put out the 75 pound anchor 150 feet up on the bank in the mud.

13. The Agnes B continued to push full ahead against the starboard side of the barge for about an hour, or until about 10:30 A. M. At that time some men had arrived on the west bank of the river from the Mayronne Mud and Chemical Company with a pump. The Agnes B cast off from The TJ–318 and crossed the river to pick them up. The Mayronne men went aboard The TJ–318 and began to shift the dry cargo forward and to jettison wet and damaged cargo. They also installed the pump in the after compartment of the barge. From then on, the jettisoning and shifting of the cargo, and the pumping of the barge

90

continued until about 5:30 A. M. October 13, when The Agnes B and The M/V Mudbug, which had arrived at the scene at about 7:30 P. M. October 12, after having been dispatched there by libelant, took The TJ–318 in tow and proceeded back to the Mayronne dock at Harvey, Louisiana, arriving at 1:50 P. M. on October 13th.

14. After the barge had been brought to Harvey and the remaining cargo discharged, an inspection revealed that there was an open hole about 2 inches in diameter in the hull of the barge approximately two feet to eighteen inches below deck in the after rake on the port side. This hole was the sole proximate cause of the sinking. The hole was not discoverable from the deck by the character of examination made by Mr. Meyers in Mr. Cox's presence aboard the Barge TJ–318 on October 10, 1951. It was a hole which had been left by the repair yard in July 1951 when an internal pipe had been cropped off inside the barge, with the resulting hole being left open and uncovered.

15. Neither libelant nor the Tug Agnes B was shown to have been guilty of any negligence causing or contributing to the loss of cargo. After the sinking condition of the barge was discovered, nothing could have been done to stop her except beaching as was done. As the stern continued to take in water through the open hole and defective manhole gaskets, the damage to the deck cargo became progressively worse. How much occurred at any particular time cannot be determined.

16. Respondent has sought to show that the barge was so loaded with pallets of cargo covering her manholes that access thereto for pumping was prevented until the same pallets were removed. Even if this fact were established, there is no evidence showing that the delay contributed to the loss.

17. The jettisoning of cargo was ordered by those on the scene, after unavailing efforts had first been made to raise the sunken end of the barge by moving mud from the submerged and sinking stern to the bow. At the time there was grave and justified fear of loss of the barge and of all her cargo from the wave wash of ships passing nearby, and from the continued ingress of water through the submerged hole and submerged defective manhole gaskets. The cargo jettisoned consisted largely of cargo already seriously damaged and worthless from river water.

18. Libelant, as a result of the incidents aforesaid sustained the following damages:

| | |
|---|---:|
| Loss of cargo | $12,601.15 |
| Paid Tug Agnes B for salvage services | 78.00 |
| Expenses and services of Mudbug for proceeding to scene, standing by and assisting TJ–318 back to Harvey | 420.00 |
| Labor costs | 332.00 |
| Total | $13,431.15 |

### Conclusions of Law

■ 1. Since this case involves a charter party which is a maritime contract, this court has jurisdiction. 28 U. S.C. Sec. 1333.

■ 2. The charter of the Barge TJ–318 by libelant from respondent carried with it an implied warranty of seaworthiness. Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012; The Edwin I. Morrison, 153 U.S. 199, 14 S.Ct. 823, 38 L. Ed. 688; The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; The Cullen No. 32, 2 Cir., 62 F.2d 68; The Fred E. Hasler, 2 Cir., 55 F.2d 919; Patton-Tully Transp. Corp. v. Barrett, 6 Cir., 37 F.2d 516.

■ 3. This implied warranty of seaworthiness can be displaced only by clear, unequivocal language, plainly and unambiguously negativing its existence. The Caledonia, 157 U.S. 124, 137, 15 S.Ct. 537, 39 L.Ed. 644; Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780; The Framlington Court, 5 Cir., 69 F.2d 300. "When shipowners contemplate the release of their vessels from liability, as affects the implied warranty

of seaworthiness for the service undertaken, they should do so in plain and unequivocal terms." Dempsey v. Downing, 4 Cir., 11 F.2d 15, 17. Further, the charter party was executed on a printed form furnished by respondent and the language on which respondent relies is included in the printed part of the form. Consequently, it is to be construed narrowly against the respondent. Compania de Navigacion La Flecha v. Brauer, 168 U.S. 104, 18 S.Ct. 12, 42 L.Ed. 398; Metropolitan Coal Co. v. Howard, supra; The Framlington Court, supra.

■■ 4. The language of the provision in the charter party "It is understood that the Charterer has had the barge inspected and found same to be in first class condition" is not so clear and unequivocal as would amount to a waiver of the warranty of seaworthiness. It is susceptible of another reasonable interpretation, as for example, that the barge is in first class condition to serve the purpose intended by the charterer. Moreover, the fact that a vessel is in apparent first class condition does not discharge the owner from the obligation to furnish a seaworthy vessel since the warranty against unseaworthiness covers latent defects not discoverable by inspection. Work v. Leathers, supra; The Caledonia, supra.

5. Respondent relies most heavily on Portsmouth Fisheries Co. v. John L. Roper Lumber Co., 4 Cir., 269 F. 586. In that case the barge in question was a wooden one stranded on a mud flat and accepted for use by charterer in that condition. There the charter party itself, when considered with the circumstances surrounding its execution, sufficiently negatives the warranty of sea-worthiness. Here the barge in question was a steel one, lately in a shipyard where she received substantial repairs. The barge here sank because of a defect in her hull left by the repair yard, not because the bottom fell out from having been stranded on a mud flat as in the Portsmouth Fisheries case.[1]

■ 6. The charges of negligence on which respondent seeks to predicate a defense are improper loading of pallets over the hatch covers so as to prevent pumping, and unnecessarily and imprudently jettisoning the cargo. Neither has been proved. The alleged improper loading of pallets has not been shown to have contributed to the loss, and the decision to jettison was, under the circumstances of this case, justified. At most it was the exercise of judgment in an emergency created by the unseaworthiness of the barge. It is not now to be narrowly scrutinized, weighed in delicate balance and adjudicated on the basis of ex post facto criticism from persons not actually confronted with the decision in the emergency. But for the decision to jettison, the loss could well have been total. Moreover, the decision to jettison concerned libelant's own cargo which apparently was needed at that time on the location to which it was then being transported. Under the circumstances, it is difficult to believe that the cargo was deliberately or recklessly thrown overboard in order to mulct this respondent in damages. Chapman v. United States, 5 Cir., 194 F.2d 974; P. Dougherty Co. v. United States, 3 Cir., 207 F.2d 626; Page v. United States, D. C., 105 F. Supp. 99, 1952 A.M.C. 893.

7. Libelant is entitled to recover $13,431.15 from respondent.

Let a decree be entered accordingly.

1. For a later Fourth Circuit case which distinguishes the Portsmouth Fisheries case and applies the principles here expounded, see Dempsey v. Downing, supra.