---

## THE H. A. ROCK.

District Court, W. D. New York. November 2, 1927.

1. Shipping ⟨⟩101—Ship, whose entire cargo was shipped by one shipper to certain mill and elevator corporation, was private carrier.

Ship, whose entire cargo was, according to bill of lading, shipped by one shipper to order of certain mill and elevator corporation, was private carrier.

2. Shipping ⟨⟩141(3)—Winds not amounting to storm on Lake Michigan and ice field on Lake Erie held not "peril of the sea."

Fresh winds not amounting to storm on Lake Michigan and ice field on Lake Erie held not peril of sea, which would excuse broken water pipe on ship; "peril of the sea" being storm or condition catastrophic in character.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

3. Shipping ⟨⟩132(5)—Evidence held insufficient to show that breaking of water pipe on ship, which damaged cargo, was due to negligent navigation through ice field.

Breaking of water pipe on ship, resulting in damage to cargo, held not due to negligent navigation of ship by master through ice field in Lake Erie, in view of evidence, where master did what all other ship captains, of which there were 40 or 50 in vicinity, were doing.

4. Shipping ⟨⟩121(1)—In every contract for carriage of goods by sea, unless otherwise stipulated, there is warranty that ship is seaworthy at beginning of voyage.

In every contract for carriage of goods by sea, unless otherwise expressly stipulated, there is warranty on part of shipowner that ship is seaworthy at beginning of voyage, and not merely that he does not know her to be unseaworthy, or that he has used best efforts to make her seaworthy.

5. Shipping ⟨⟩132(5⅓)—Evidence held not to show sufficient inspection of ship before sailing to determine seaworthiness, in view of method of inspecting pipe which broke.

Evidence held not to show that due diligence was used to inspect ship prior to sailing to determine seaworthiness, where pipe which broke during voyage, damaging cargo, was not tapped with hammer or otherwise to determine soundness.

6. Shipping ⟨⟩132(3)—In action for damage to cargo from broken pipe, shipowner must show that due diligence was used to make vessel seaworthy before voyage.

In action against shipowner for damage to cargo by breaking of pipe during voyage, burden of proving that due diligence had been used to make vessel seaworthy before voyage is on shipowner.

7. Shipping ⟨⟩111—Purchaser of grain, to whom bill of lading was indorsed and delivered, is proper party to sue for subsequent damage to cargo.

One who bought grain, and to whom bill of lading was indorsed and delivered, became owner of cargo, and was proper party to bring suit for subsequent damage.

In Admiralty. Libel by the Eastern Grain Mill & Elevator Corporation against the steamer H. A. Rock, her engines, boilers, etc.; the Forest City Steamship Company, claimant. Decree for libelant.

Holding, Duncan & Leckie, of Cleveland, Ohio, for libelant.

Kelley, David & Cottrell, of Cleveland, Ohio, and Single & Single, of New York City (Forrest E. Single, of New York City, of counsel), for respondent.

ADLER, District Judge. [1] On January 20 to 22, 1926, a cargo of 244,675 bushels of No. 2 white oats was loaded on board the steamer H. A. Rock at Chicago. The oats were held at storage there during the winter, and were to be carried by the steamer to Buffalo at the opening of navigation. The entire cargo was, according to the bill of lading, shipped by one shipper, Rosenbaum Bros., Inc., to the order of Eastern Grain Mill & Elevator Corporation, Buffalo, New York. The ship was therefore a private carrier. The testimony is that the cargo was purchased and the bill of lading was indorsed in blank by Rosenbaum Bros., Inc., and was delivered to the libelant on or about April 8, 1926.

Before sailing, the ship was inspected by the United States local inspectors, and there were other independent inspections. The ship sailed from Chicago at 1:20 a. m. on May 3, 1926. It encountered fresh winds, not, however, amounting to a storm, on its trip down Lake Michigan. The trip was un-

eventful until the ship arrived to within 40 or 50 miles of Buffalo, when, at the eastern end of Lake Erie, it encountered a field of ice. It reached this ice field about May 7th, and did not get through the ice and arrive at the elevator at Buffalo until the evening of May 13th. There were 40 or 50 vessels attempting to make their way through this field of ice at that time; some of them on their way to Buffalo, and others leaving Buffalo. The captain of the Rock apparently used the same tactics and methods as the other masters of vessels in his attempt to buck his way through the ice. The vessel would be backed up, and it would then be forced ahead at full speed, until slowed up and stopped by the ice field, and then the process would be repeated. The testimony is that on May 7th the Rock was assisting another steamer, the Crowley, to make its way through the ice; that while doing so the Rock's propeller came in contact with floating ice, and the ends of all four blades were broken off. Thereafter their progress was very slow, and she was ultimately taken to the dock by a tug.

The testimony is that the propeller blades were broken on the evening of May 8, 1926. About that time the wheelman of the Rock started to go into the hold in order to oil the steering gear. He testified that, when he raised the manhole hatch, he heard water running, and discovered that it was running from a break in the joint of the water service line where it led up through No. 1 cargo compartment. The joint where the break occurred was a short distance below the deck. He said that he immediately told the captain, and the testimony is that the broken joint was repaired. There is a conflict in the testimony as to whether this break was discovered before or after the breaking off of the propeller blades. Witnesses for the respondent testified that the break in the water service line was discovered the day after the propeller broke. Other witnesses, members of the crew, testified that the leak in the service line was discovered before the propeller was broken. The broken joint was immediately repaired, and it appears that the broken pieces were immediately thrown overboard into the lake.

The ship arrived at the dock in Buffalo on the evening of May 13, and began to discharge cargo on May 14, 1926. It was then found that the grain in the ship had been damaged by a large quantity of water that had run into the cargo. In No. 1 hold there was a pyramid of a mass of blackened and burned grain under the deck on the port side forward of No. 1 hatch, which was at the place where the break in the pipe occurred. In the No. 1 hold the depth of damage of the grain was in the neighborhood of 15 feet practically all over the compartment. In No. 2 compartment the grain was wetted and damaged up to 4 feet deep at the forward end and 2 feet deep at the after end, approximately. In No. 3 hold the grain was damaged about 2 feet deep at the forward end of the hold, and extended aft for a distance of about 30 feet. Immediately under the point where the pipe had burst, the grain was blackened and burned, and there was considerable growth of grass. The damaged grain was reconditioned and a great part of it salvaged. A certain quantity was thrown overboard.

There is no dispute as to the condition of the cargo at the time of its loading at Chicago, and at the time of its unloading at Buffalo. There is no dispute that the damage to the cargo occurred from the water flowing into the cargo from the broken joint in the water service line.

[2] The contention of the respondent is that the broken pipe, from which water was discharged into the cargo, was broken either by an accident of navigation, due to a peril of the sea, or that it was broken by reason of negligent navigation on the part of the officers of the ship; that in either event the respondent is not liable. I am led to the conclusion that the weather met with by the ship in its run down Lake Michigan, which was suggested as being sufficiently stormy to bring about the breaking of the pipe, was not unusual weather, and does not come within the description of a peril of the sea. It was not sufficiently severe to break a sound and properly installed pipe. The only other period in the voyage during which it is contended that the danger of navigation or peril of the sea was responsible for the breaking of the pipe was when the ship passed through the ice field in the eastern end of Lake Erie.

The accepted definition of a "peril of the sea" is a storm or a condition catastrophic in character. I find that the condition of the lake in the vicinity of Buffalo at the time the Rock pushed its way through was not of such a character. It was a condition of navigation reasonably to be expected in the lake at that time of the year, and not only were a large number of ships entering Buffalo at the same time the Rock did, but a number of others left the port of Buffalo at that time, knowing that the ice field was directly before them. Navigation of the field of ice through which the Rock passed in entering

Buffalo was not of a character to burst or break a properly constructed pipe or elbow. The Charlton Hall (D. C.) 265 F. 640.

[3] There is the further question as to whether, if the pipe was broken during the passage of the Rock through the ice, the break resulted from the negligent navigation of the ship by its master. Upon this point there was evidence given to the effect that the master of the Rock assisted another ship, the Crowley, to break through the ice; that in doing so he misused and strained his vessel to such an extent that the ends of the propeller blades were broken off, and it is suggested that the break in the water pipe occurred at or about the same time. I find that this contention is not borne out. The master of the Rock was doing only what all of the other ship captains, of which there were 40 or 50 in the vicinity, were doing at the same time. The ice field in question was not a solid mass of ice, but it was a field of soft material, through which all the shipowners on the lakes found it practicable to navigate although necessarily slowly.

. I do not find from the evidence that there was such a shock or wrenching to the vessel as the result of this process through the ice field as to rupture a properly constructed pipe within the vessel itself. In fact, with the exception of the breaking off of the tips of the propeller wheel, which resulted from their striking a solid piece of ice, there is no evidence of any destruction or disturbance of any other part of the vessel's structure. In the case of this particular pipe or elbow, the hanger which connected it with the deck of the ship was not disturbed or moved out of place, and many other parts in the interior of the ship were much frailer in construction than the joint in the water service line, and were not disturbed. In fact, the elbow which was said to have been broken is of much heavier construction than any other part of the pipe.

[4] Finding, as I do, that the break did not occur through peril of the sea or negligent navigation, after the ship left its berth at Chicago; did the respondent exercise due diligence to make her seaworthy on sailing, and was she in fact seaworthy? The case of the Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644; is authority on the question of the warranty of seaworthiness. In that case the court quotes the following language:

"In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence."

Chief Justice Fuller says in the opinion: "We see no reason to doubt the correctness of the rule thus enunciated. The shipowner's undertaking is not merely that he will do and has done his best to make the ship fit, but that the ship is really fit to undergo the perils of the sea and other incidental risks to which she must be exposed in the course of the voyage; and, this being so, that undertaking is not discharged because the want of fitness is the result of latent defects."

The result is that the warranty of seaworthiness is absolute, and does cover latent defects not ordinarily susceptible of detection. The Edith (C. C. A.) 10 F.(2d) 684, and cases cited.

[5] There was considerable evidence offered on the part of the respondent to the effect that inspections were carefully made prior to the sailing of the vessel, and the vessel was pronounced seaworthy in every particular. I have examined carefully the evidence on this subject, and I believe that it would have been easily possible for the inspectors to have overlooked a flaw or break in this particular pipe. When the piping was being inspected, there was no water going through the fresh water line, and on account of the location of the elbow, and the short piece of pipe involved in this particular case, a break or hole would not have been easily discernible from an ordinary inspection.

[6] When water was pumped through the fresh water line it was necessary to use the large pump to get the required pressure. There is no evidence that the pipes were tapped with a hammer or otherwise to determine their soundness. The burden of proving that due diligence has been used to make a vessel seaworthy is upon the shipowner. The evidence does not disclose that such due diligence was exercised in this case. The Leerdam (C. C. A.) 17 F.(2d) 586; The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; Warner Sugar Refining Co. v. Munson Steamship Line (Southern Dist. of N. Y., July 22, 1927) 23 F.(2d) 194, 1927 A. M. C. 1437; W. T. Lockett Co. v. Cunard S. S. Co. (D. C.) 21 F.(2d) 191.

In view of the conclusions I have ar-

rived at, as above set forth, it is not necessary to make a guess as to the exact time when the break occurred in this pipe, or just what the cause of the break was. I do find that the pipe and elbow were not in perfect condition at the time the ship broke ground at Chicago.

[7] There remains the question raised by respondent that title did not pass to the libelant before delivery, and, since the damage was done before delivery, the proper party to bring this suit is the party in whom the title to the oats was before delivery. The testimony is that the plaintiff bought the grain at Chicago on April 8, 1926. The bill of lading was duly indorsed and delivered to libelant. Under the authority of The Niagra (D. C.) 297 F. 667, affirmed (C. C. A.) 297 F. 670, and cases cited, the libelant became the owner of the cargo by purchase and indorsement and delivery of the bill of lading. In the instant case the direct testimony is that the purchase was made on April 8, 1926, and in every theory of the damage to the cargo, that damage occurred subsequent to that date.

Decree for libelant.